















JPP   2/21/02   9:47

3:02-CV-00308   SAFECO INSURANCE V. COMMERCIAL MONEY

*1*

*CMP.*

Michael T. Lowe, Bar No. 49608
James G. Stanley, Bar No. 138696
BOOTH, MITCHEL & STRANGE LLP
Attorneys at Law
701 South Parker Street, Suite 6500
P.O. Box 11055
Orange, CA 92856-8155
(714) 480-8500 / FAX:  (714) 480-8533

Attorneys for Plaintiff
SAFECO INSURANCE COMPANY OF AMERICA

*FILED*

02 FEB 20  PM 2: 39

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

'02 CV  0308 J  (POR)

| | |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation,<br><br>Plaintiff,<br><br>vs.<br><br>COMMERCIAL MONEY CENTER, INC., a Nevada corporation; COMMERCIAL SERVICING CORPORATION, a Nevada corporation; CAPITAL MARKETS CORPORATION, a corporation; STERLING WAYNE PIRTLE, an individual; ANITA PIRTLE, an individual; RONALD FISHER, an individual; and NANCY FISHER, an individual,<br><br>Defendants. | Case No.<br><br>SAFECO INSURANCE COMPANY'S COMPLAINT FOR DAMAGES:<br><br>1.  BREACH OF INDEMNITY AGREEMENT;<br>2.  SPECIFIC PERFORMANCE OF INDEMNITY AGREEMENT;<br>3.  EQUITABLE INDEMNITY;<br>4.  MONEY PAID;<br>5.  EXONERATION;<br>6.  *QUIA TIMET*;<br>7.  BREACH OF SALES AND SERVICING AGREEMENT;<br>8.  SPECIFIC PERFORMANCE OF SALES AND SERVICING AGREEMENT;<br>9.  ACCOUNTING |

Plaintiff SAFECO INSURANCE COMPANY OF AMERICA ("SAFECO") alleges:

## JURISDICTION AND VENUE

1.      SAFECO is, and at all times relevant hereto was, a corporation organized and existing under the laws of the State of Washington with its principal place of business in the State of Washington.

2.      SAFECO is qualified to conduct and conducts business in the State of California, as a surety.

-1-

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

3.      Upon information and belief, defendant COMMERCIAL MONEY CENTER, INC. ("CMC"), is, and at all times relevant hereto was, a Nevada corporation, conducting business in the City of Escondido, State of California.

4.      Upon information and belief, defendant COMMERCIAL SERVICING CORPORATION ("CSC") is, and at all times relevant hereto was, a Nevada corporation, conducting business in the City of Escondido, State of California.

5.      Upon information and belief, defendant CAPITAL MARKETS CORPORATION ("CMARK") is, and at all times relevant hereto was, authorized to conduct and is conducting business in the City of Escondido, State of California.

6.      Defendant STERLING WAYNE PIRTLE ("WAYNE PIRTLE") is, and at all times relevant hereto was, an individual domiciled in the State of Nevada. WAYNE PIRTLE is president of CMC and is an indemnitor with respect to those CMC transactions which are relevant hereto, which transactions occurred in substantial part in the City of Escondido. State of California.

7.      Defendant ANITA PIRTLE is, and at all times relevant hereto was, an individual domiciled in the State of Nevada. ANITA PIRTLE is an indemnitor with respect to those CMC transactions which are relevant hereto, which transactions occurred in substantial part in the City of Escondido, State of California.

8.      On information and belief, defendant RONALD FISHER is, and at all times relevant hereto was, an individual domiciled in the State of California. RONALD FISHER is an indemnitor with respect to those CMC transactions which are relevant hereto, which transactions occurred in substantial part in the City of Escondido, State of California.

9.      On information and belief, defendant NANCY FISHER is, and at all times relevant hereto was, an individual domiciled in the State of California. NANCY FISHER is an indemnitor with respect to those CMC transactions which are relevant hereto, which transactions occurred in substantial part in the City of Escondido, State of California.

10.     The amount in controversy as to each of the claims asserted herein exceeds $75,000.

-2-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

11.     This Court has jurisdiction of this matter under 28 U.S.C. §§1332 and 1367(a), and venue in this District is proper under 28 U.S.C. §1391(a).

## GENERAL ALLEGATIONS

12.     SAFECO is informed and believes, and on that basis alleges, that each of the defendants is the principal, agent, servant, employee or alter ego of each of the other defendants, and was acting in that capacity at all times relevant hereto.

13.     SAFECO is also informed and believes, and on that basis alleges, that CSC is an affiliate or subsidiary of CMC and/or CMARK, and is a principal, agent, servant, employee or alter ego of each of the other defendants, and was acting in that capacity at all times relevant hereto.  As such, CSC is hereafter collectively referred to, together with CMC and CMARK, as CMC.

## CMC'S LEASING PROGRAMS

14.     CMC purports to operate as a full service leasing company offering a variety of leasing programs.

15.     As part of its leasing programs, CMC purports to purchase various equipment of use to both individuals and small-to-mid-size businesses, and to then lease that equipment to third party individuals or businesses.

16.     Upon information and belief, CMC operates its leasing programs in its own name, and through its subsidiaries and affiliates, through offices located in Escondido, California.

17.     CMC groups its leases into lease pools.  CMC's lease pools include between 20 and 150 leases.

18.     Upon information and belief, CMC sells the stream of payments provided by the leases in a given pool as an investment to a lending institution.

## SURETY BONDING OF CMC'S LEASING PROGRAMS

19.     In order to make the lease pool a more attractive investment, CMC obtains surety bonds to guarantee each lessee's performance of its lease obligations.

20.     Beginning on June 14, 1999, and continuing through June 1, 2000, CMC

-3-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

1 requested SAFECO, as surety, to issue lease bonds on its behalf in connection with
2 various lease pools.

3    21.    SAFECO, as surety, issued lease bonds ("the Bonds") on behalf of CMC's
4 lessees, as principals, and in favor of CMC, as obligee.

5    22.    Ultimately, SAFECO issued over 696 separate Bonds, guaranteeing lease
6 obligations grouped into 14 different lease pools.

7 ## CMC'S INDEMNITY AGREEMENT

8    23.    On or about April 30, 1999, in partial consideration for SAFECO's issuance of
9 the Bonds, and as an inducement to SAFECO to issue the Bonds, CMC, through its
10 president WAYNE PIRTLE, executed a written Indemnity Agreement for the benefit of
11 SAFECO. A true and correct copy of that Indemnity Agreement is attached hereto as
12 Exhibit "A" and is incorporated by this reference as though set forth fully herein.

13    24.    WAYNE PIRTLE and ANITA PIRTLE (hereinafter collectively referred to as
14 the "PIRTLES") and RONALD FISHER and NANCY FISHER (hereinafter collectively
15 referred to as the "FISHERS") also executed that Indemnity Agreement in favor of
16 SAFECO on or about April 30, 1999.

17 ## CMARK'S INDEMNITY AGREEMENT

18    25.    On or about June 24, 1999, in partial consideration for SAFECO's issuance of
19 the Bonds, and as an inducement to SAFECO to issue the Bonds, CMARK, through its
20 president WAYNE PIRTLE, executed a written Indemnity Agreement for the benefit of
21 SAFECO. A true and correct copy of that Indemnity Agreement is attached hereto as
22 Exhibit "B" and is incorporated by this reference as though set forth fully herein.

23    26.    The PIRTLES and the FISHERS also executed that Indemnity Agreement in
24 favor of SAFECO on or about June 24, 1999.

25    27.    The April 30, 1999, Indemnity Agreement and the June 24, 1999, Indemnity
26 Agreement (hereinafter collectively referred to as the "Indemnity Agreements") provide,
27 among other things, that CMC, the PIRTLES and the FISHERS will indemnify and save
28 harmless SAFECO from and against all losses, costs, damages, attorney's fees and

-4-
## SAFECO'S COMPLAINT FOR DAMAGES

1   expenses of whatever kind or nature which arise by reason of, or in consequence of,

2   SAFECO's issuance of the Bonds at CMC's request.

3          28.    The Indemnity Agreements also provide that CMC, the PIRTLES and the

4   FISHERS will, on SAFECO's demand, pay to SAFECO, or deposit with SAFECO, as

5   collateral, an amount sufficient to discharge any claim made against SAFECO on any of the

6   Bonds.

7          29.    The Indemnity Agreements also give SAFECO the right, until it receives

8   conclusive proof of its discharge without loss from any of the Bonds, and until it has been

9   otherwise fully indemnified under each of the Indemnity Agreements, to freely access CMC,

10  the PIRTLES and the FISHERS' books, records and accounts for the purposes of

11  examining and copying the accounts.

12         30.    In executing the Indemnity Agreements, CMC, the PIRTLES and the

13  FISHERS explicitly represented and warranted therein that each of them is and was

14  specifically and beneficially interested in obtaining each Bond which SAFECO issued.

## THE SALE AND SERVICING AGREEMENTS

16         31.    CMC sold the stream of lease payments in a given SAFECO lease pool to

17  investors pursuant to a "Sale and Servicing Agreement."  Under the Sale and Servicing

18  Agreement, of which there were 14, one for each lease pool, CMC also sold and

19  transferred to investors its rights to payment under SAFECO's Bonds.  A true and correct

20  copy of one such Sale and Servicing Agreement between CMC, as seller, and NetB@nk,

21  as purchaser, is attached hereto as Exhibit "C" and is incorporated by this reference as

22  though set forth fully herein.

23         32.    The Sale and Servicing Agreement appoints SAFECO the Servicer of the

24  pooled leases sold thereunder, although the agreement also provides that CMC and/or

25  CSC will operate as the Sub-Servicer of the pooled leases.  Indeed, under the Sale and

26  Servicing Agreement, CMC and/or CSC have full control of the leases, the payments from

27  the various lessees pursuant to the leases and the transfer of those payments to the

28  investors.  SAFECO has no control over or access to the leases or the payments

-5-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

1    thereunder.

2        33.    In addition and as part of the transaction establishing the lease pools and

3    bonding commitments, a written Assignment of Contract Rights under Each Lease,

4    Collection Account Deposits, Rights under the Safeco Bonds and All Proceeds Thereof was

5    executed by CMC. An exemplar of said assignment is attached as Exhibit "D."

6    <u>**CLAIMS MADE AGAINST SAFECO**</u>

7        34.    On or about December 28, 2001, SAFECO received a claim from NetB@nk,

8    a federal savings bank and a CMC investor, stating that CMC was delinquent in making

9    payments to NetB@nk on seven investment lease pools and was delinquent specifically in

10    its payment for the month of December 2001 in the amount of $901,406.42. A true and

11    correct copy of NetB@nk's claim letter is attached hereto as Exhibit "E" and is incorporated

12    by this reference as though set forth fully herein.

13        35.    By letter dated December 26, 2001, Epic Funding Corporation ("Epic

14    Funding"), another CMC investor, gave notice to SAFECO that it had not received its

15    monthly payment of $144,525.28 for November 2001 or $144,525.28 for December 2001.

16    Subsequently, the January 2002 payment of $144,525.28 also fell due. A true and correct

17    copy of Epic Funding's claim letter is attached hereto as Exhibit "F" and is incorporated by

18    this reference as though set forth fully herein. By a second letter dated January 8, 2002,

19    Epic Funding further advised that it considered the payment failure a "Service Termination

20    Event" and demanded $2,792,367.59 from SAFECO. A true and correct copy of Epic

21    Funding's letter is attached hereto as Exhibit "G" and is incorporated by this reference as

22    though set forth fully herein.

23        36.    Further, on or about February 19, 2002, SAFECO received oral notice of a

24    claim from Guardian Capital LLC, yet another CMC investor, advising that it too had not

25    received its monthly payment of approximately $300,000 from CMC. No claim letter has

26    yet been received, but once it is received, SAFECO will amend its claim herein accordingly.

27    <u>**PAYMENTS MADE BY SAFECO PURSUANT TO CLAIMANT DEMANDS**</u>

28        37.    Pursuant to the written demands of NetB@nk and Epic Funding as set out

-6-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

above, and due to certain unique financial difficulties being faced by these claimants,
particularly NetB@nk, and as an accommodation to CMC, the PIRTLES and the FISHERS,
SAFECO made the following payments:

| DATE | PAYEE | AMOUNT |
|------|-------|--------|
| February 1, 2002 | NetB@nk | $901,406.42 |
| February 8, 2002 | Epic Funding | $433,575.84 |

38.    In making said payments on behalf of CMC, the PIRTLES and the FISHERS, and pursuant to the terms and conditions of the Indemnity Agreements referenced above, SAFECO is entitled to reimbursement of said payments in the full amount of each, and in addition is entitled to interest, attorney's fees and costs incurred as a result of making said payments.

## FIRST CAUSE OF ACTION

### (Breach of Indemnity Agreements Against All Defendants)

39.    SAFECO realleges and incorporates by reference paragraphs 1 through 38 as though set forth fully herein.

40.    CMC, the PIRTLES and the FISHERS' failure to indemnify SAFECO as required under the Indemnity Agreements, to reimburse SAFECO for claims made against and paid by SAFECO, to deposit collateral with SAFECO as required under the Indemnity Agreements, and to grant SAFECO access to CMC, the PIRTLES and the FISHERS' books, records and accounts constitute a breach or breaches of the Indemnity Agreements.

41.    As a direct and proximate result of CMC, the PIRTLES and the FISHERS' breach of the Indemnity Agreements, SAFECO is being irreparably harmed, and has been and will be incurring liability, losses, costs and damages, including attorney's fees, in the prosecution of this action.

WHEREFORE, SAFECO prays for judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Specific Performance of Indemnity Agreements Against All Defendants)

42.    SAFECO realleges and incorporates by reference paragraphs 1 through 41

-7-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

1  as though fully set forth herein.

2       43.    SAFECO is entitled to an order compelling CMC, the PIRTLES and the

3  FISHERS, and each of them, to specifically perform pursuant to the terms of the Indemnity

4  Agreements by, among other things, paying, indemnifying, saving and holding harmless

5  SAFECO from and against all losses, expenses and claims related to the Bonds which

6  SAFECO issued; obtaining SAFECO's discharge from the Bonds; depositing collateral with

7  SAFECO in an amount sufficient to discharge the claims made against SAFECO; and/or

8  providing SAFECO with free access to CMC, the PIRTLES and the FISHERS' books,

9  records and accounts.

10       WHEREFORE, SAFECO prays for judgment as hereinafter set forth.

11                    **THIRD CAUSE OF ACTION**

12              **(Equitable Indemnity Against All Defendants)**

13       44.    SAFECO realleges and incorporates by reference paragraphs 1 through 43

14  as though set forth fully herein.

15       45.    By reason of the foregoing, SAFECO has incurred and will continue to incur

16  losses, costs, damages, attorney's fees and expenses by reason of or in consequence of

17  the Bonds it issued at CMC, the PIRTLES and the FISHERS' request and in satisfying

18  CMC's principal obligations.

19       46.    Further, SAFECO has also incurred and will continue to incur losses, costs,

20  damages, attorney's fees and expenses by reason of or in consequence of CMC's breach

21  of the Sale and Servicing Agreements.

22       47.    CMC, the PIRTLES and the FISHERS, and each of them, are obligated by

23  law and equity to indemnify SAFECO for the full extent of its losses, costs, damages,

24  attorney's fees and expenses.

25       WHEREFORE, SAFECO prays for judgment as hereinafter set forth.

26                    **FOURTH CAUSE OF ACTION**

27              **(Money Paid Against All Defendants)**

28       48.    SAFECO realleges and incorporates by reference paragraphs 1 through 47

-8-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

1    as though set forth fully herein.

2        49.    CMC, the PIRTLES and the FISHERS, and each of them, became indebted,

3    and will become indebted, to SAFECO for money paid, laid out and expended, and/or to be

4    paid, laid out and expended, on behalf of CMC, the PIRTLES and the FISHERS at their

5    special instance and request.

6        50.    As a result of defendants' actions, SAFECO is entitled to reimbursement for

7    all sums expended and has been and will be damaged in an amount to be determined at

8    trial.

9        WHEREFORE, SAFECO prays for judgment as hereinafter set forth.

10                          **FIFTH CAUSE OF ACTION**

11                   **(Exoneration Against All Defendants)**

12       51.    SAFECO realleges and incorporates by reference paragraphs 1 through 50

13   as though set forth fully herein.

14       52.    By virtue of having made payments and incurring losses, costs, damages,

15   attorney's fees and expenses, and by virtue of having to make further payments and incur

16   further losses, costs, damages, attorney's fees and expenses, by reason of or in

17   consequence of the Bonds it issued at CMC, the PIRTLES and the FISHERS' special

18   instance and request, SAFECO is entitled to exoneration from CMC, the PIRTLES and the

19   FISHERS for such losses, costs, damages, attorney's fees and expenses.

20       WHEREFORE, SAFECO prays for judgment as hereinafter set forth.

21                          **SIXTH CAUSE OF ACTION**

22                   **(*Quia Timet* Against All Defendants)**

23       53.    SAFECO realleges and incorporates by reference paragraphs 1 through 52

24   as though set forth fully herein.

25       54.    SAFECO fears that it will continue to incur immediate and substantial losses,

26   costs, damages, attorney's fees and expenses by reason of, or in consequence of, the

27   Bonds it issued at CMC, the PIRTLES and the FISHERS' special instance and request.

28       55.    CMC, the PIRTLES and the FISHERS are obligated, under the doctrine of

-9-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

1 | *Quia Timet*, to post collateral security with SAFECO for all losses, costs, damages,

2 | attorney's fees and expenses incurred by reason of, or in consequence of, the Bonds it

3 | issued at CMC, the PIRTLES and the FISHERS' special instance and request.

4 |     56.    SAFECO is entitled to an injunction replacing CMC as the Sub-Servicer on

5 | the bonded leases.  SAFECO is also entitled to an order requiring CMC to provide an

6 | accounting.  Alternatively, SAFECO is entitled to a preliminary injunction appointing a

7 | receiver as to CMC.

8 |     WHEREFORE, SAFECO prays for judgment as hereinafter set forth.

9 | **SEVENTH CAUSE OF ACTION**

10 | **(Breach of Sale and Servicing Agreement Against CMC)**

11 |     57.    SAFECO realleges and incorporates by reference paragraphs 1 through 56

12 | as though fully set forth herein.

13 |     58.    CMC's failure to remit payment, under the applicable Sale and Servicing

14 | Agreements, to NetB@nk and Epic Funding of the payments from the various lessees

15 | pursuant to the pooled leases, constitutes a breach or breaches of those Sale and

16 | Servicing Agreements.

17 |     59.    As a direct and proximate result of CMC's breach of the Sale and Servicing

18 | Agreements, SAFECO is being irreparably harmed, has been and will be incurring liability,

19 | losses, costs and damages, including attorney's fees, in an amount to be proven at trial.

20 |     60.    SAFECO has satisfied all conditions precedent under the terms of the Sale

21 | and Servicing Agreements prior to initiating the present proceedings against CMC.

22 |     WHEREFORE, SAFECO prays for judgment as hereinafter set forth.

23 | **EIGHTH CAUSE OF ACTION**

24 | **(Specific Performance of Sale and Servicing Agreements Against CMC)**

25 |     61.    SAFECO realleges and incorporates by reference paragraphs 1 through 60

26 | as though fully set forth herein.

27 |     62.    SAFECO is entitled to an order compelling CMC to specifically perform

28 | pursuant to the terms of the Sale and Servicing Agreements by, among other things,

-10-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

remitting lease payments, under the applicable agreements, to NetB@nk and Epic Funding for payments made by SAFECO to those claimants and to Guardian Capital LLC as such claim is presented.

WHEREFORE, SAFECO prays for judgment as hereinafter set forth.

## NINTH CAUSE OF ACTION

### (Accounting Against CMC)

63.     SAFECO realleges and incorporates by reference paragraphs 1 through 62 as though fully set forth herein.

64.     SAFECO has repeatedly demanded that CMC, as Sub-Servicer under the Sale and Servicing Agreements, account for lease payments received from the various leases pursuant to the pooled leases.  CMC, while providing certain accounting information to SAFECO, refused, and continues to fail and refuse, to render a complete, thorough and detailed accounting to SAFECO, particularly as reflecting  the current bank accounts of defendants, and each of them, the account balances, the path of monies flowing into and out of said lease accounts and to investors, the apparent commingling of incoming monies into common, undifferentiated accounts and failure to explain why payments promised to investors were not paid, despite specific representations to SAFECO that such payments would be made, in whole or in part.

65.     As a result of the foregoing, SAFECO is entitled to an accounting from CMC, as Sub-Servicer under the Sale and Servicing Agreements, regarding its disposition of all lease payments received from the various lessees pursuant to the pooled leases.

WHEREFORE, SAFECO prays for judgment as follows:

1.     For damages according to proof at trial;

2.     For prejudgment interest thereon at the legal rate;

3.     For reasonable attorney's fees and expenses incurred herein;

4.     For costs of suit herein;

5.     For an order requiring defendants, and each of them, to perform specifically the terms and conditions of the Indemnity Agreements;

-11-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

6.     For an order requiring defendants, and each of them, to perform specifically the terms and conditions of the Sale and Servicing Agreements;

7.     For an accounting as to bonded lease payments; and

8.     For such other and further relief as this Court may deem necessary and proper.

Dated:  February 20, 2002                          BOOTH, MITCHEL & STRANGE LLP

                                                   By: _____
                                                       MICHAEL T. LOWE
                                                       JAMES G. STANLEY
                                                       Attorneys for Plaintiff
                                                       SAFECO INSURANCE COMPANY
                                                       OF AMERICA

-12-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

# EXHIBIT TABLE OF CONTENTS

| ITEM | EXHIBIT PAGE |
|------|-------------|
| Indemnity Agreement dated April 30, 1999 | A15 |
| Indemnity Agreement dated June 26, 1999 | B24 |
| Sale and Servicing Agreement | C33 |
| Assignment | D76 |
| NetB@nk Letter dated December 28, 2001 | E79 |
| Epic Funding Letter dated December 26, 2001 | F83 |
| Epic Funding Letter dated January 8, 2001 | G85 |

-13-

SAFECO'S COMPLAINT FOR DAMAGES

[C:\DOC\MTL\22594\PLD\001Complaint(230)]

A.14



**SAFECO**

**GENERAL AGREEMENT OF INDEMNITY**

GENERAL INSURANCE COMPANY OF AMERICA
GENERAL INSURANCE COMPANY OF AMERICA
FIRST NATIONAL INSURANCE COMPANY OF AMERICA
SAFECO NATIONAL INSURANCE COMPANY
HOME OFFICE: SAFECO PLAZA
SEATTLE, WASHINGTON 98185

*Original mailed to HO 5/3/99 sd*

THIS AGREEMENT is made by the Undersigned in favor of the SAFECO Insurance Companies for the purpose of indemnifying them from all loss and expense in connection with any Bonds for which any SAFECO Insurance Company now is or hereafter becomes Surety for any as Principal: COMMERCIAL MONEY CENTER, INC.

In consideration of the execution of any such Bonds for Principal and as an inducement to such execution by Surety, the Undersigned, jointly and severally, agree as follows.

DEFINITIONS: Where they appear in this agreement, the following terms shall be considered as defined in this section:

**Principal:** Any one, combination of, or all of the persons, firms or corporations set forth above or their successors in interests, whether alone or in joint venture with others not named herein.

**Bond:** Any and all bonds, undertakings or instruments of guarantee and any renewals or extensions thereof executed by Surety on behalf of Principal.

**Surety:** Any one or combination of the following: SAFECO Insurance Company of America; General Insurance Company of America; First National Insurance Company of America; SAFECO National Insurance Company; any person or company joining with any of the aforesaid companies in executing any Bond, executing any Bond at their request or providing reinsurance to them with respect to any Bond.

INDEMNITY TO SURETY:  Undersigned agree to pay to Surety upon demand:

1. All loss and expense, including reasonable attorney fees, incurred by Surety by reason of having executed any Bond or incurred by it on account of any breach of this agreement by any of the Undersigned;
2. An amount sufficient to discharge any claim made against Surety on any Bond. This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any bond;
3. Any premium due for any Bond, computed according to the rates currently charged by Surety, including renewal premiums until proof satisfactory to surety is furnished of its discharge from liability under any Bond.

With respect to claims against Surety:

1. Surety shall have the exclusive right for itself and the Undersigned to determine in good faith whether any claim or suit upon any Bond shall, on the basis of liability, expediency or otherwise, be paid, compromised, defended or appealed.
2. Surety may incur such expenses, including reasonable attorneys' fees, as deemed necessary or advisable in the investigation, defense and payment of such claims.
3. Surety's determination in good faith of the foregoing shall be final and conclusive upon the Undersigned.
4. An itemized statement of loss and expense incurred by Surety, sworn to by an officer of Surety, shall be prima facie evidence of the fact and extent of the liability of Undersigned to Surety in any claim or suit by Surety against Undersigned.
5. Separate suits may be brought under this agreement as causes of action accrue, and the pendency or termination of any such suit shall not bar any subsequent action by Surety.
6. Undersigned authorize Surety to join any and all of the Undersigned as parties defendant in any action, regardless of venue, against Surety on account of any Bond, and to enforce the obligations hereunder directly against any of the undersigned without the necessity of first proceeding against the Principal.

GENERAL PROVISIONS:

1. Assent by Surety to changes in any Bond or refusal to assent shall not release or affect the obligations of Undersigned to Surety.
2. Surety shall have the right to decline to execute any Bond.
3. Surety shall have every right, defense or remedy which a personal surety without compensation would have, including the right of exoneration, and the right of subrogation.
4. Until Surety shall have been furnished with competent evidence of its discharge, without loss from any Bonds, Surety shall have the right to free access at reasonable times to the books, records and accounts of each of the Undersigned for the purpose of examining them. Each one of the Undersigned hereby authorizes any depositories in which funds of any of the undersigned may be deposited to furnish to Surety the amount of such deposits as of any date requested, and any legal entity doing business with the Undersigned is authorized to furnish any information requested by Surety concerning any transaction. Surety may furnish in confidence copies of any information, which it now has or may hereafter obtain concerning each of the Undersigned, to other persons or companies for the purpose of procuring co-suretyship or reinsurance or of advising interested persons or companies.
5. The Undersigned will, on request of Surety, procure the discharge of Surety from any Bond and all liability by reason thereof. If such discharge is unattainable, the Undersigned will, if requested by Surety, either deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such bond or bonds, or make provisions acceptable to Surety for the funding of the bonded obligation.
6. Undersigned warrant that each of them is specifically and beneficially interested in the obtaining of each Bond.
7. In case the execution hereof by any of the Undersigned may be defective or invalid for any reason, such defect or invalidity shall not in any manner affect the validity of this obligation or the liability hereunder of any other of the Undersigned. Invalidity of any provision of this agreement by reason of the laws of any state or for any other reason shall not render the other provisions hereof invalid.
8. Execution by Principal or any of the Undersigned of any application for any Bond or of any other agreement of indemnity in behalf of Principal, or the taking of indemnity of any other person by Surety with respect to any Bond of Principal, shall in no way be deemed to waive, diminish or abrogate any rights of Surety under this agreement.
9. All parties agree that any microfilmed, scanned or electronically digitized copy of this document made by Surety as part of its record storage and retention program shall be as effective as the original for all purposes.

**TERMINATION:** This agreement is a continuing obligation of the Undersigned unless terminated as provided in this paragraph. An Undersigned desiring to terminate liability as to future Bonds of Principal must:

1. Give written notice to Surety at its home office, Seattle, Washington 98185, by certified or registered mail of such

2. State in such notice the effective date (not less than thirty days after the receipt of notice by Surety) of termination of such Undersigned's liability for future Bonds.

After the effective date of termination, the Undersigned giving notice shall be or remain liable hereunder for Bonds executed, authorized, renewed, or extended prior to such date.

Such termination of liability as to an Undersigned shall in no way affect the obligation of any other Undersigned who has not given notice as herein provided.

EXECUTED this _____30th_____ day of ____April____ , 1999

COMMERCIAL MONEY CENTER, INC.

ATTEST: _____
RONALD FISHER, SECRETARY

BY: _____
STERLING WAYNE PIRTLE, PRESIDENT

X _____
STERLING WAYNE PIRTLE, INDIVIDUALLY

X _____
ANITA PIRTLE, INDIVIDUALLY

X _____
RONALD FISHER, INDIVIDUALLY

X _____
NANCY FISHER, INDIVIDUALLY

ALL SIGNATURES MUST BE ACKNOWLEDGED.

A-16

Page 2 of 4

S-0658/SAEF 4/98

**CORPORATE ACKNOWLEDGMENT**

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____ , _____ , before me personally appeared

_____

to me known to be the _____

the corporation executing the above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that it _____ executed said instrument by order of the Board of Directors of said corporation.

*IN WITNESS WHEREOF,* I have hereunto set my hand and affixed my Official Seal the day and year first above written.

My Commission expires _____        _____

(SEAL)                                Notary Public, residing at _____

---

**INDIVIDUAL ACKNOWLEDGMENT: (To Be Used by Persons Who Sign As an Individual.)**

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____ , _____ , before me personally appeared

_____ , to

me known and known to me to be the individual(s) described in and who executed the foregoing agreement and acknowledged that _____ executed the same for the purposes, considerations and uses therein set forth as _____ free and voluntary act and deed.

*IN WITNESS WHEREOF,* I have hereunto set my hand and affixed my Official Seal, the day and year first above written.

My Commission expires _____        _____

(SEAL)                                Notary Public, residing at _____

---

**CORPORATE ACKNOWLEDGMENT**

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____ , _____ , before me personally appeared

_____

to me known to be the _____

the corporation executing the above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that it _____ executed said instrument by order of the Board of Directors of said corporation.

*IN WITNESS WHEREOF,* I have hereunto set my hand and affixed my Official Seal the day and year first above written.

My Commission expires _____        _____

(SEAL)                                Notary Public, residing at _____

---

**INDIVIDUAL ACKNOWLEDGMENT: (To Be Used by Persons Who Sign As an Individual.)**

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared

_____

_____ , to

me known and known to me to be the individual(s) described in and who executed the foregoing agreement and acknowledged that

_____ executed the same for the purposes, considerations and uses therein set forth as _____ free and voluntary act and deed.

*IN WITNESS WHEREOF*, I have hereunto set my hand and affixed my Official Seal, the day and year first above written.

My Commission expires _____    _____

(SEAL)                                            Notary Public, residing at _____

**CORPORATE ACKNOWLEDGMENT**

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared

_____

to me known to be the _____

the corporation executing the above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that it executed said instrument by order of the Board of Directors of said corporation.

*IN WITNESS WHEREOF*, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

My Commission expires _____    _____

(SEAL)                                            Notary Public, residing at _____

**INDIVIDUAL ACKNOWLEDGMENT: (To Be Used by Persons Who Sign As an Individual.)**

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared

_____

_____ , to

me known and known to me to be the individual(s) described in and who executed the foregoing agreement and acknowledged that

_____ executed the same for the purposes, considerations and uses therein set forth as _____ free and voluntary act and deed.

*IN WITNESS WHEREOF*, I have hereunto set my hand and affixed my Official Seal, the day and year first above written.

My Commission expires _____    _____

(SEAL)                                            Notary Public, residing at _____

CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of _California_

County of _Orange_

On _4/30/97_ before me, _R. Mendoza, Notary Public_
     DATE                               NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared  STERLING WAYNE PIRTLE

                                      NAME(S) OF SIGNER(S)

☒ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

R. MENDOZA
Commission # 1158812
Notary Public - California
Orange County
My Comm. Expires Oct 17, 2001

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

──────────── **OPTIONAL** ────────────

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUAL
☐ CORPORATE OFFICER

                       TITLE(S)

☐ PARTNER(S)     ☐ LIMITED
                  ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

**DESCRIPTION OF ATTACHED DOCUMENT**

GENERAL AGREEMENT OF INDEMNITY
TITLE OR TYPE OF DOCUMENT

4
NUMBER OF PAGES

DATE OF DOCUMENT

SIGNER(S) OTHER THAN NAMED ABOVE

S-4067/GEEF 2/98        © 1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

A-19

CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of _California_

County of _Orange_

On _4/30/99_ before me, _R. Mendoza, Notary Public_

personally appeared  ANITA PIRTLE

NAME(S) OF SIGNER(S)

☑ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

R. MENDOZA
Commission # 1158812
Notary Public - California
Orange County
My Comm. Expires Oct 17, 2001

WITNESS my hand and official seal.

SIGNATURE OF NOTARY

———————————— OPTIONAL ————————————

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUAL
☐ CORPORATE OFFICER

————————————————
TITLE(S)

☐ PARTNER(S)        ☐ LIMITED
                    ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

_____
_____

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)

_____

_____

**DESCRIPTION OF ATTACHED DOCUMENT**

GENERAL AGREEMENT OF INDEMNITY
TITLE OR TYPE OF DOCUMENT

4
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

S-4067/GEEF 2/98           © 1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

A-20

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

No. 5907

State of _Ca l forn a_

County of _Orange_

On _4/30/99_ _____ before me, _R. Mendoza, Notary Public_
DATE                                    NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared  RONALD FISHER
                                            NAME(S) OF SIGNER(S)

☒ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

R. MENDOZA
Commission # 1158812
Notary Public - California
Orange County
My Comm. Expires Oct 17, 2001

WITNESS my hand and official seal.

_R. Mendoza_
SIGNATURE OF NOTARY

──────────── **OPTIONAL** ────────────

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)    ☐ LIMITED
                ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

_____

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)

_____

_____

**DESCRIPTION OF ATTACHED DOCUMENT**

GENERAL AGREEMENT OF INDEMNITY
TITLE OR TYPE OF DOCUMENT

4 _____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

S-4067/GEEF 2/98          © 1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

A-21

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

No. 5907

State of _California_

County of _Orange_

On _4/30/99_ before me, _____

DATE                                      NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared  NANCY FISHER _____,

NAME(S) OF SIGNER(S)

☑ personally known to me **- OR -** ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> R. MENDOZA
> Commission # 1158812
> Notary Public - California
> Orange County
> My Comm. Expires Oct 17, 2001

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

────────────────── **OPTIONAL** ──────────────────

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)      ☐ LIMITED
                  ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

_____

_____

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)

_____

_____

**DESCRIPTION OF ATTACHED DOCUMENT**

GENERAL AGREEMENT OF INDEMNITY
TITLE OR TYPE OF DOCUMENT

4 _____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

S-4067/GEEF 2/98                © 1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

A-22

B-23

**EXHIBIT B**



GENERAL AGREEMENT
OF INDEMNITY

SAFECO INSURANCE COMPANY OF AMERICA
GENERAL INSURANCE COMPANY OF AMERICA
FIRST NATIONAL INSURANCE COMPANY OF AMERICA
SAFECO NATIONAL INSURANCE COMPANY
HOME OFFICE: SAFECO PLAZA
SEATTLE, WASHINGTON 98185

**SAFECO**

THIS AGREEMENT is made by the Undersigned in favor of the SAFECO Insurance Companies for the purpose of indemnifying them from all loss and expense in connection with any Bonds for which any SAFECO Insurance Company now is or hereafter becomes Surety for any as Principal: CAPITAL MARKETS CORPORATION; ANY COMPANY WHICH IS SUBSIDIARY TO CAPITAL MARKETS CORPORATION (WHETHER NOW OWNED OR HEREAFTER CREATED OR ACQUIRED); ANY PERSON OR ENTITY FOR WHOM CAPITAL MARKETS CORPORATION REQUESTS A BOND OR BONDS.

In consideration of the execution of any such Bonds for Principal and as an inducement to such execution by Surety, the Undersigned, jointly and severally, agree as follows.

DEFINITIONS: Where they appear in this agreement, the following terms shall be considered as defined in this section:

**Principal:** Any one, combination of, or all of the persons, firms or corporations set forth above or their successors in interests, whether alone or in joint venture with others not named herein.

**Bond:** Any and all bonds, undertakings or instruments of guarantee and any renewals or extensions thereof executed by Surety on behalf of Principal.

**Surety:** Any one or combination of the following: SAFECO Insurance Company of America; General Insurance Company of America; First National Insurance Company of America; SAFECO National Insurance Company; any person or company joining with any of the aforesaid companies in executing any Bond, executing any Bond at their request or providing reinsurance to them with respect to any Bond.

INDEMNITY TO SURETY: Undersigned agree to pay to Surety upon demand:

1. All loss and expense, including reasonable attorney fees, incurred by Surety by reason of having executed any Bond or incurred by it on account of any breach of this agreement by any of the Undersigned;
2. An amount sufficient to discharge any claim made against Surety on any Bond. This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any bond;
3. Any premium due for any Bond, computed according to the rates currently charged by Surety, including renewal premiums until proof satisfactory to surety is furnished of its discharge from liability under any Bond.

With respect to claims against Surety:

1. Surety shall have the exclusive right for itself and the Undersigned to determine in good faith whether any claim or suit upon any Bond shall, on the basis of liability, expediency or otherwise, be paid, compromised, defended or appealed.
2. Surety may incur such expenses, including reasonable attorneys' fees, as deemed necessary or advisable in the investigation, defense and payment of such claims.
3. Surety's determination in good faith of the foregoing shall be final and conclusive upon the Undersigned.
4. An itemized statement of loss and expense incurred by Surety, sworn to by an officer of Surety, shall be prima facie evidence of the fact and extent of the liability of Undersigned to Surety in any claim or suit by Surety against Undersigned.
5. Separate suits may be brought under this agreement as causes of action accrue, and the pendency or termination of any such suit shall not bar any subsequent action by Surety.
6. Undersigned authorize Surety to join any and all of the Undersigned as parties defendant in any action, regardless of venue, against Surety on account of any Bond, and to enforce the obligations hereunder directly against any of the undersigned without the necessity of first proceeding against the Principal.

GENERAL PROVISIONS:

1. Assent by Surety to changes in any Bond or refusal to assent shall not release or affect the obligations of Undersigned to Surety.
2. Surety shall have the right to decline to execute any Bond.
3. Surety shall have every right, defense or remedy which a personal surety without compensation would have, including the right of exoneration, and the right of subrogation.
4. Until Surety shall have been furnished with competent evidence of its discharge, without loss from any Bonds, Surety shall have the right to free access at reasonable times to the books, records and accounts of each of the Undersigned for the purpose of examining them. Each one of the Undersigned hereby authorizes any depositories in which funds of any of the undersigned may be deposited to furnish to Surety the amount of such deposits at any date requested, and any legal entity doing business with the Undersigned is authorized to furnish any information requested by Surety concerning any transaction. Surety may furnish in confidence copies of any information, which it now has or may hereafter obtain concerning each of the Undersigned, to other persons or companies for the purpose of procuring co-suretyship or reinsurance or of advising interested persons or companies.
5. The Undersigned will, on request of Surety, procure the discharge of Surety from any Bond and all liability by reason thereof. If such discharge is unattainable, the Undersigned will, if requested by Surety, either deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such bond or bonds, or make provisions acceptable to Surety for the funding of the bonded obligation.
6. Undersigned warrant that each of them is specifically and beneficially interested in the obtaining of each Bond.
7. In case the execution hereof by any of the Undersigned may be defective or invalid for any reason, such defect or invalidity shall not in any manner affect the validity of this obligation or the liability hereunder of any other of the Undersigned. Invalidity of any provision of this agreement by reason of the laws of any state or for any other reason shall not render the other provisions hereof invalid.
8. Execution by Principal or any of the Undersigned of any application for any Bond or of any other agreement of indemnity in behalf of Principal, or the taking of indemnity of any other person by Surety with respect to any Bond of Principal, shall in no way be deemed to waive, diminish or abrogate any rights of Surety under this agreement.
9. All parties agree that any microfilmed, scanned or electronically digitized copy of this document made by Surety as part of its record

B-24

11/07/00  09:24 FAX 7144373058                                                    ☒003

**TERMINATION:**  This agreement is a continuing obligation of the Undersigned unless terminated as provided in this paragraph.  An Undersigned desiring to terminate liability as to future Bonds of Principal must:

1.  Give written notice to Surety at its home office, Seattle, Washington 98185, by certified or registered mail of such

2.  State in such notice the effective date (not less than thirty days after the receipt of notice by Surety) of termination of such Undersigned's liability for future Bonds.

After the effective date of termination, the Undersigned giving notice shall be or remain liable hereunder for Bonds executed, authorized, renewed, or extended prior to such date.

Such termination of liability as to an Undersigned shall in no way affect the obligation of any other Undersigned who has not given notice as herein provided.

EXECUTED this _____24th_____ day of _____June_____, _1979_

CAPITAL MARKETS CORPORATION

ATTEST: _Ronald Fisher_
RONALD FISHER, SECRETARY

BY: _Sterling W Pirtle_
STERLING WAYNE PIRTLE, PRESIDENT

X _Sterling W Pirtle_
STERLING WAYNE PIRTLE, INDIVIDUALLY

X _Anita Pirtle_
ANITA PIRTLE, INDIVIDUALLY

X _Ronald Fisher_
RONALD FISHER, INDIVIDUALLY

X _Nancy Fisher_
NANCY FISHER, INDIVIDUALLY

B-25

ALL SIGNATURES MUST BE ACKNOWLEDGED.

CORPORATE ACKNOWLEDGMENT

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared

_____

to me known to be the _____

the corporation executing the above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that it _____ executed said instrument by order of the Board of Directors of said corporation.

*IN WITNESS WHEREOF,* I have hereunto set my hand and affixed my Official Seal the day and year first above written.

My Commission expires _____

(SEAL)                    Notary Public, residing at _____

---

INDIVIDUAL ACKNOWLEDGMENT: (To Be Used by Persons Who Sign As an Individual.)

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared

_____ to

me known and, known to me to be the individual(s) described in and who executed the foregoing agreement and acknowledged that _____ executed the same for the purposes, considerations and uses therein set forth as _____ free and voluntary act and deed.

*IN WITNESS WHEREOF,* I have hereunto set my hand and affixed my Official Seal, the day and year first above written.

My Commission expires _____

(SEAL)                    Notary Public, residing at _____

---

CORPORATE ACKNOWLEDGMENT

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared

_____

to me known to be the _____

the corporation executing the above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that it _____ executed said instrument by order of the Board of Directors of said corporation.

*IN WITNESS WHEREOF,* I have hereunto set my hand and affixed my Official Seal the day and year first above written.

My Commission expires _____

(SEAL)                    Notary Public, residing at _____

B-26

11/07/00  09:24 FAX 7144373058    ☑005

INDIVIDUAL ACKNOWLEDGMENT: (To Be Used by Persons Who Sign As an Individual.)

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared
_____
_____, to
me known and known to me to be the individual(s) described in and who executed the foregoing agreement and acknowledged that
executed the same for the purposes, considerations and uses therein set forth as _____ free and voluntary act and deed.

*IN WITNESS WHEREOF*, I have hereunto set my hand and affixed my Official Seal, the day and year first above written.

My Commission expires _____    _____

(SEAL)                                        Notary Public, residing at _____

## CORPORATE ACKNOWLEDGMENT

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared
_____

to me known to be the _____

the corporation executing the above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said
corporation, for the uses and purposes therein mentioned, and on oath stated that the seal affixed is the seal of said corporation and that it
_____ executed said instrument by order of the Board of Directors of said corporation.

*IN WITNESS WHEREOF*, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

My Commission expires _____    _____

(SEAL)                                        Notary Public, residing at _____

## INDIVIDUAL ACKNOWLEDGMENT: (To Be Used by Persons Who Sign As an Individual.)

STATE OF _____

COUNTY OF _____ } ss

On this _____ day of _____, _____, before me personally appeared
_____
_____, to
me known and known to me to be the individual(s) described in and who executed the foregoing agreement and acknowledged that
executed the same for the purposes, considerations and uses therein set forth as _____ free and voluntary act and deed.

*IN WITNESS WHEREOF*, I have hereunto set my hand and affixed my Official Seal, the day and year first above written.

My Commission expires _____    _____

(SEAL)                                        Notary Public, residing at _____

11/07/00  09:24 FAX 7144373058 ................    ☑006

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of _California_

County of _Orange_

On _6/24/97_ before me, _R. Mendoza, Notary Public_
    DATE                NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared  STERLING WAYNE PIRTLE

                                NAME(S) OF SIGNER(S)

☑ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> R. MENDOZA
> Commission # 1158312
> Notary Public - California
> Orange County
> My Comm. Expires Oct 17, 2001

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

─────────── **OPTIONAL** ───────────

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

### CAPACITY CLAIMED BY SIGNER

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
               TITLE(S)

☐ PARTNER(S)    ☐ LIMITED
                  ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

_____
_____

### SIGNER IS REPRESENTING:

NAME OF PERSON(S) OR ENTITY(IES)

CAPITAL MARKETS CORPORATION

### DESCRIPTION OF ATTACHED DOCUMENT

GENERAL AGREEMENT OF INDEMNITY
TITLE OR TYPE OF DOCUMENT

4
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

B-28

CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of _California_

County of _Orange_

On _6/24/99_ before me, _R Mendoza Notary Public_
DATE                              NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared ANITA PIRTLE
                                          NAME(S) OF SIGNER(S)

☒ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

R. MENDOZA
Commission # 1158812
Notary Public - California
Orange County
My Comm. Expires Oct 17, 2001

WITNESS my hand and official seal.

SIGNATURE OF NOTARY

─────────── OPTIONAL ───────────

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

CAPACITY CLAIMED BY SIGNER

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)    ☐ LIMITED
                ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

_____
_____
_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

CAPITAL MARKETS CORPORATION

DESCRIPTION OF ATTACHED DOCUMENT

GENERAL AGREEMENT OF INDEMNITY
TITLE OR TYPE OF DOCUMENT

4
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

B-29

S-4067/GEEF 2/98                © 1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of _California_

County of _Orange_

On _6/24/98_ before me, _R. Mendoza, Notary Public_
DATE

NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared  RONALD FISHER

NAME(S) OF SIGNER(S)

☑ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

R. MENDOZA
Commission # 1158812
Notary Public - California
Orange County
My Comm. Expires Oct 17, 2001

WITNESS my hand and official seal.

SIGNATURE OF NOTARY

―――――――――― OPTIONAL ――――――――――

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

CAPACITY CLAIMED BY SIGNER

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)    ☐ LIMITED
               ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

CAPITAL MARKETS CORPORATION

DESCRIPTION OF ATTACHED DOCUMENT

GENERAL AGREEMENT OF INDEMNITY
TITLE OR TYPE OF DOCUMENT

4
NUMBER OF PAGES

DATE OF DOCUMENT

SIGNER(S) OTHER THAN NAMED ABOVE

B-30

CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of ___California___

County of ___Orange___

On ___6/24/99___ before me, ___R. Mendoza, Notary Public___
    DATE                  NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared ___NANCY FISHER___
                                  NAME(S) OF SIGNER(S)

☒ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

R. MENDOZA
Commission # 1158812
Notary Public - California
Orange County
My Comm. Expires Oct 17, 2001

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

──────── **OPTIONAL** ────────

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)   ☐ LIMITED
                 ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____
_____
_____

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)

CAPITAL MARKETS CORPORATION

**DESCRIPTION OF ATTACHED DOCUMENT**

GENERAL AGREEMENT OF INDEMNITY
TITLE OR TYPE OF DOCUMENT

4
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

B-31

C·32

**EXHIBIT C**

# SALE AND SERVICING AGREEMENT

## AMONG

Net.B@nk, A Federal Savings Bank
PURCHASER

COMMERCIAL MONEY CENTER, INC.
SELLER

SAFECO INSURANCE COMPANY OF AMERICA
SERVICER

COMMERCIAL MONEY CENTER, INC.
AS SUB-SERVICER

DATED AS OF December 22, 1999

12% LEASE OBLIGATIONS, NET.B@NK, A Federal Savings Bank, PURCHASER

POOL PRINCIPAL BALANCE: $3,020,818.84

C-33

## TABLE OF CONTENTS

Page

**ARTICLE I**............................................................................................................2-1
    SECTION 1.1  **Definitions**.................................................................................2-1
    SECTION 1.2  **Usage of Terms** .....................................................................2-10
    SECTION 1.3  **Calculations**............................................................................2-10
    SECTION 1.4  **Section References** ................................................................2-10
    SECTION 1.5  **RESERVED** ...........................................................................2-10

**ARTICLE II**...........................................................................................................2-10
    SECTION 2.1  **Conveyance of Leases and Related Assets** .........................2-10
    SECTION 2.2  **Custody of Lease Files** ..........................................................2-12
    SECTION 2.3  **Further Assurances** ...............................................................2-13
    SECTION 2.4  **Representations and Warranties of Seller**.............................2-13
    SECTION 2.5  **Reserved** ...............................................................................2-15
    SECTION 2.6  **Repurchase of Leases Upon Breach of Representations and Warranties**2-15
    SECTION 2.7  **Closing** ..................................................................................2-16
    SECTION 2.8  **Termination of this Agreement** ..............................................2-17
    SECTION 2.9  **Assignment or Transfer by the Purchaser of Transferred Assets and Security Interests** .........................................................2-17
    SECTION 2.10  **Income Tax Characterization** ..............................................2-17

**ARTICLE III**..........................................................................................................2-17
    SECTION 3.1  **Duties of the Servicer** ............................................................2-17
    SECTION 3.2  **Collection of Lease Payments; Modifications of Leases** ........2-18
    SECTION 3.3  **Realization Upon Leases** .......................................................2-19
    SECTION 3.4  **Insurance and Taxes** .............................................................2-20
    SECTION 3.5  **[Reserved]**..............................................................................2-22
    SECTION 3.6  **Covenants, Representations, and Warranties of Servicer** ......2-22
    SECTION 3.7   **Sub-Servicers** ......................................................................2-23
    SECTION 3.8  **Expenses of Servicer.** ............................................................2-24
    SECTION 3.9  **Servicer's Report** ...................................................................2-24
    SECTION 3.10  **Annual Statement as to Compliance; Servicer Termination Event Notice**2-24
    SECTION 3.11  **Annual Independent Accountants' Report** ...........................2-25
    SECTION 3.12  **Access to Certain Documentation and Information Regarding Leases** .2-25
    SECTION 3.13  **Protection of Lease Assets** ..................................................2-26

**ARTICLE IV** .........................................................................................................2-26
    SECTION 4.1  **Collection Account**..................................................................2-26
    SECTION 4.2  **Initial Deposit**.........................................................................2-26
    SECTION 4.3  **Collections**..............................................................................2-26
    SECTION 4.4  **Application of Collections** .......................................................2-27
    SECTION 4.5  **Net Deposits** ..........................................................................2-27
    SECTION 4.6  **Servicer Advances** .................................................................2-28
    SECTION 4.7  **Distributions**...........................................................................2-28
    SECTION 4.8  **Servicing Account** ..................................................................2-28
    SECTION 4.9  **Reserved** ...............................................................................2-28
    SECTION 4.10  **Reserved** .............................................................................2-29
    SECTION 4.11  **General Provisions Regarding Servicing Account & Collection Account**2-29

**ARTICLE V** ................................................................................................................2-31
    SECTION 5.1 **No Servicing Fees.** .............................................................2-31

**ARTICLE VI** ...............................................................................................................2-31
    SECTION 6.1 **Reserved** ............................................................................2-31
    SECTION 6.2 **Reserved** ............................................................................2-31
    SECTION 6.3 **Reserved** ............................................................................2-32
    SECTION 6.4 **Covenants of the Seller** ....................................................2-32
    SECTION 6.5 **Maintenance of Security Interests in Equipment**................2-34

**ARTICLE VII** ..............................................................................................................2-34
    SECTION 7.1 **Liability of Servicer; Indemnities** .......................................2-34
    SECTION 7.2 **Merger or Consolidation of, or Assumption of Obligations of, the Servicer**2-34
    SECTION 7.3 **Limitation on Liability of Servicer and Others** ....................2-35
    SECTION 7.4 **Servicer Not to Resign** ......................................................2-35
    SECTION 7.5 **Corporate Existence** .........................................................2-36

**ARTICLE VIII** .............................................................................................................2-36
    SECTION 8.1 **Servicer Termination Event** ...............................................2-36
    SECTION 8.2 **Termination of Servicer; Consequences of a Servicer Termination Event**2-37
    SECTION 8.3 **Servicer to Act; Appointment of Successor**.........................2-37
    SECTION 8.4 **Notification to CMC** ...........................................................2-38
    SECTION 8.5 **Waiver of Past Defaults** ....................................................2-38

**ARTICLE IX** ...............................................................................................................2-38
    SECTION 9.1 **Substitution** ......................................................................2-38
    SECTION 9.2 **Procedure** .........................................................................2-39
    SECTION 9.3 **Reserved.** ..........................................................................2-40
    SECTION 9.4 **CMC's and Servicer's Subsequent Obligations** ................2-40

**ARTICLE X** ................................................................................................................2-40
    SECTION 10.1 **Amendment** .....................................................................2-40
    SECTION 10.2 **Protection of Title to Lease Assets** ...................................2-40
    SECTION 10.3 **Governing Law** .................................................................2-41
    SECTION 10.4 **Severability of Provisions**..................................................2-41
    SECTION 10.5 **Assignment** ......................................................................2-41
    SECTION 10.6 **Third-Party Beneficiaries** .................................................2-41
    SECTION 10.7 **Counterparts**....................................................................2-41
    SECTION 10.8 **Intention of Parties**...........................................................2-42
    SECTION 10.9 **Notices** .............................................................................2-42
    SECTION 10.10 **Time is of the Essence**....................................................2-42

C-35

EXHIBITS

Exhibit A -- **Schedule of Leases and Equipment**

Exhibit B -- **Form of Servicer's Report**


C-36

**THIS SALE AND SERVICING AGREEMENT**, dated as of December 22, 1999, is made among NET.B@NK, INC., a Federal Savings Bank (the "Purchaser"), COMMERCIAL MONEY CENTER, INC., a Nevada corporation, as Seller and as Sub-Servicer (the "Seller" and "CMC"), and SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation, as Servicer (the "Servicer").

In consideration of the mutual agreements herein contained, and of other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.1 **Definitions.** Whenever capitalized and used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

*Accountants' Report*:  The report of a firm of Independent Accountants described in Section 3.11.

*Accounting Date:*  With respect to a Payment Date, the last day of the preceding calendar month.

*Adjusted Lease:*   A Lease that has had one or more terms adjusted or modified by the Servicer, other than modifications permitted by Section 3.2.

*Administrative Fee:*  With respect to any Collection Period, all administrative fees, expenses and charges collected in respect of the Leases during such Collection Period, including late fees, late payment interest, documentation fees, insurance administration charges and any Extension Fees.

*Affiliate:*  With respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms *"controlling"* and *"controlled"* have meanings correlative to the foregoing.

*Agreement:*  This Sale and Servicing Agreement, all amendments and supplements thereto and all exhibits and schedules to any of the foregoing.

*Amount Available:*  With respect to any Payment Date, the sum of (i) the Scheduled Payments, Liquidation Proceeds, and Purchase Amounts on deposit in the Collection Account as of the immediately preceding Deposit Date for such Payment Date, plus (ii) Servicer Advances, plus (iii) earnings on eligible investments.

*Authorized Officer:*  With respect to the Seller, any officer of the Seller who is authorized to act for the Seller and who is identified on the list of Authorized Officers delivered by the Seller to the Purchaser on the Closing Date (as such list may be modified or supplemented from time to time thereafter).

*Book Value:*  With respect to any Equipment, the residual value of such Equipment as shown on the accounting books and records of CMC as of the Cut-Off Date.  The Book Value for each item of Equipment shall be set forth on Exhibit A hereto (as the same may be revised from time to time).

*Business Day:* Any day (other than a Saturday, Sunday or legal holiday) on which commercial Banking institutions in California, Nevada and Georgia or any other location of any successor Servicer or Sub-Servicer are open for regular business.

*Closing Date:* December 22, 1999.

*CMC:* Commercial Money Center, Inc., a Nevada corporation.

*Collection Account:* The account designated as such in, and established and maintained pursuant to, Section 4.1

*Collection Period:* With respect to a Payment Date, the calendar month or portion of the calendar month preceding the month in which such Payment Date occurs (such calendar month or portion thereof being referred to as the "related" Collection Period with respect to such Payment Date), and the last Collection Period shall be the sixtieth full calendar month following the Closing Date. With respect to an Accounting Date, the Collection Period in which such Accounting Date occurs is referred to herein as the "related" Collection Period with respect to such Accounting Date. Only the Monthly Interest Distributable Amount will be due and payable on the first Payment Date if the preceding Collection Period is less than a full calendar month.

*Collection Records:* All manually prepared or computer generated records relating to collection efforts or payment histories with respect to the Leases.

*Cut-Off Date:* The Initial Cut-Off Date or, in the case of a Substitute Lease, the first day of the month of transfer of such Substitute Lease to the Purchaser.

*Defaulted Lease:* Any Lease for which a default exists, as of any date.

*Deposit Date:* The Business Day immediately preceding the related Determination Date.

*Determination Date:* The first Business Day immediately preceding the related Payment Date.

*Eligible Account:* (i) A deposit account maintained at an Eligible Institution the deposits in which are fully insured by the FDIC.

*Eligible Institution:* Any depository institution organized under the laws of the United States or any state, the deposits of which are insured to the full extent permitted by law by the Bank Insurance Fund of the FDIC, which is subject to supervision and examination by federal or state authorities and whose short-term deposits, commercial paper or other short-term debt obligations have been rated at least P-1 by Moody's, A-1 by S&P, F1 by Fitch (if rated by Fitch) and D-1 by Duff & Phelps (if rated by Duff & Phelps) or whose unsecured long-term debt has been rated in one of the two highest rating categories by each Rating Agency (if rated by such Rating Agency).

*Eligible Investments:* An Eligible Account

*Eligible Lease:* A Lease at all times satisfying the Representations and Warranties.

C-38

*Eligible Servicer:* The Servicer named herein or another Person which at the time of its appointment as Servicer (i) is servicing a portfolio of equipment lease contracts, installment sale contracts, promissory notes, loan and security agreements and/or other similar types of receivables comparable to the Leases, (ii) is legally qualified and has the capacity to service the Leases, (iii) has demonstrated the ability professionally and competently to service a portfolio of equipment lease contracts, installment sale contracts, promissory notes, loan and security agreements and other similar types of receivables comparable to the Leases with reasonable skill and care, (iv) has available software which is adequate to perform its duties and responsibilities under this Agreement and (v) is acceptable to the Purchaser.

*Equipment:* The Equipment subject to a Lease, as more particularly described on Exhibit A hereto (as the same may be revised from time to time).

*Extension Fees:* Any fee received by the Servicer in consideration for the granting of an extension on the payment of any Scheduled Payment due under a Lease.

*Indebtedness:* With respect to any Person at any time, (a) indebtedness or liability of such Person for borrowed money whether or not evidenced by bonds, debentures, notes or other instruments, or for the deferred purchase price of property or services (including trade obligations); (b) obligations of such Person as lessee under leases which should have been or should be, in accordance with generally accepted accounting principles, recorded as capital leases; (c) current liabilities of such Person in respect of unfunded vested benefits under plans covered by Title IV of ERISA; (d) obligations issued for or liabilities incurred on the account of such Person; (e) obligations or liabilities of such Person arising under acceptance facilities; (f) obligations of such Person under any guarantees, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person or otherwise to assure a creditor against loss; (g) obligations of such Person secured by any Lien on property or assets of such Person, whether or not the obligations have been assumed by such Person; or (h) obligations of such Person under any interest rate or currency exchange agreement.

*Independent Accountants:* Has the meaning specified in Section 3.11(a).

*Initial Cut-Off Date:* December 1, 1999

*Initial Pool Principal Balance:* $3,020,818.84; being the Present Value of payment stream discounted to effect Interest Rate yield.

*Insurance and Tax Accounts:* The accounts which are established and maintained pursuant to Section 3.4(a).

*Insurance Policy:* Any insurance policy benefiting the lessor or secured party under a Lease providing loss or physical damage, theft or similar coverage with respect to the Equipment.

*Interest Carryover Shortfall:* With respect to any Payment Date, the excess, if any, of the Interest Distributable Amount for the preceding Payment Date over the amount that was actually distributed in respect of interest on the Outstanding Principal Amount on such preceding Payment Date, plus, to the extent permitted by law, an amount equal to one-twelfth of the product of (i) the Interest Rate and (ii) such excess.

*Interest Distributable Amount:* With respect to any Payment Date, the sum of the Monthly Interest Distributable Amount and the Interest Carryover Shortfall for such Payment Date.

*Interest Rate:* 12% per annum.

*Lease Assets:* The property and proceeds of every description with respect to the Leases and the Equipment conveyed by the Seller, together with the Purchaser's Accounts (including Eligible Investments therein and all proceeds therefrom).

*Lease File:* The documents, electronic entries, instruments and writings listed in Section 2.2 pertaining to a particular Lease.

*Lease Obligations:* The 12% Lease Obligations, Net.B@nk 1999-1 Series 8, consisting of all amounts payable to the Purchaser hereunder in amounts sufficient for the Purchaser to recover the Monthly Base Distribution Amount on each Payment Date up to and including the last Collection Period Payment Date, whether from Scheduled Payments, realizations upon the security interests granted hereunder, or other amounts as provided herein.

*Leases:* The lease contracts listed on Exhibit A hereto (excluding any such lease contract which has become a Purchased Lease but including all Substitute Leases) and all rights and obligations under such contracts, including, without limitation, all monies at any time paid or payable thereon or in respect thereof on and after the Cut-Off Date (whether in the form of (i) Scheduled Payments (excluding those Scheduled Payments due prior to, but not received as of, the Cut-Off Date, but including those Scheduled Payments due on or after, but received prior to, the Cut-Off Date), (ii) Prepayments, (iii) Liquidation Proceeds (including all net proceeds from the disposition of the related Equipment), (iv) Extension Fees, (v) payments to be applied by the Servicer to the payment of insurance charges, taxes or other similar obligations or (vi) payments to be retained by the Servicer in payment of Administrative Fees, or otherwise), and all rights of the lessor in the related Equipment, Insurance Policies, Surety Bonds and any other security for the payment of amounts due under such contracts.

*Lease Types:* All forms but not limited to, equipment, titled vehicles, aircraft, boats & vessels, etc. herein referred to as equipment

*Lien:* Any security interest, lien, charge, pledge, preference, equity or encumbrance of any kind, including tax liens, mechanics' liens and any liens that attach by operation of law.

*Liquidated Lease:* With respect to any Collection Period, except with respect to a Lease which is assigned to the issuer of the related Surety Bond, (i) a Lease which, during such Collection Period, was charged off as uncollectible by the Servicer in accordance with its credit and collection policies and procedures (which shall be no later than the date as of which the Servicer has repossessed and disposed of the related Equipment and otherwise collected all proceeds (including any proceeds of insurance to be applied as described in Section 3.4(c)(ii)) which, in the Servicer's reasonable judgment, can be collected under such Lease) following a default thereunder or upon damage to or destruction of such Equipment (if such Equipment is not to be replaced or repaired in accordance with Section 3.4(c)(i)), or (ii) a Lease as to which, during such Collection Period, 10% or more of a Scheduled Payment shall have become 120 days delinquent.

*Liquidation Proceeds:* All amounts received by the Servicer (i) in connection with the liquidation of any Lease and disposition of the related Equipment or (ii) as insurance proceeds with respect to any damaged or destroyed Equipment to be applied as described in Section 3.4(c)(ii), in each case net of (a) reasonable out-of-pocket expenses incurred by or on behalf of the Servicer in connection with the

C-40

collection on such Lease and the maintenance, repossession, repair, storage and disposition of the related Equipment (including taxes and insurance charges, to the extent in excess of amounts available therefor and relating to such Lease in the Insurance and Tax Accounts, as well as attorneys' fees) and (b) amounts that are required to be refunded to the Obligor on such Lease; provided, however, that the Liquidation Proceeds with respect to any Lease and disposition of the related Equipment shall in no event be less than zero.

*Monthly Base Distribution Amount:*  $ 67,196.45.  The Monthly Base Distribution Amount is subject to adjustment only to reflect the effects of Purchased Leases and as mutually agreed to by the Seller, the Servicer and the Purchaser.

*Monthly Interest Distributable Amount:*  (a) With respect to any Payment Date other than the first Payment Date, an amount equal to one-twelfth of the product of the Interest Rate and the Principal Balance of all Leases on such Payment Date before giving effect to any payments made in respect of such Payment Date; (b) in the case of the first Payment Date, an amount equal to the product of the Interest Rate, the Original Principal Amount, and a fraction, the numerator of which is 10 and the denominator of which is 360

*Monthly Total Distribution Amount:*  (a) With respect to any Payment Date, other than the first and last Payment Date, and the related Collection Period, the sum of the Monthly Base Distribution Amount plus all Purchase Amounts on deposit in the Collection Account as of the related Deposit date; (b) for the first Payment Date, the Monthly Interest Distributable Amount, and (c) for the last Payment Date, the greater of the Monthly Base Distribution Amount and the Principal Balance for all Leases on such date plus the Interest Distributable Amount.

*Monthly Records:*  All records and data maintained by the Servicer with respect to the Leases in accordance with its customary standards, policies and procedures.

*Nonrecoverable Servicer Advance:*  Any Servicer Advance previously made by the Servicer which the Servicer has determined based on its sole discretion will not be reimbursed from recoveries on the Lease with respect to which the Servicer Advance was made.

*Obligor:*  The lessee, borrower, purchaser or any other Person or Persons who are obligated to make payments under a Lease.

*Officer's Certificate:* A certificate signed by any Authorized Officer of the Seller and delivered to the Servicer.  Unless otherwise specified, any reference in this Agreement to an Officer's Certificate shall be to an Officer's Certificate of any Authorized Officer of the Seller.  Every Officer's Certificate with respect to compliance with a condition or covenant provided for in this Agreement shall include:

(i)  a statement that each signatory of such certificate has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

(ii)  a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate are based;

(iii)  a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with; and

C-41

(iv) a statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with.

*Opinion of Counsel:* A written opinion of counsel reasonably acceptable in form and substance and from counsel reasonably acceptable to the Purchaser.

*Original Principal Amount:* $3,020,818.84; being the Present Value of the payment stream discounted to effect Interest Rate yield.

*Original Term:* The remaining term of a Lease as of the Cut-Off Date (which shall include any renewals or extensions of the original term thereof prior to the Cut-Off Date), as such term may be extended in accordance with Section 3.2(c) or as a result of a bankruptcy Proceeding with respect to the related Obligor, but excluding, in the case of any Lease, any other extensions or renewals thereof.

*Outstanding Principal Amount:* As of any date, with respect to the Lease Obligations, the Original Principal Amount less all distributions previously made to the Purchaser in respect of principal (before giving effect to distributions of principal made on such date).

*Payment Date:* The seventh day of each calendar month (or, if such seventh day is not a Business Day, the next succeeding Business Day), commencing January 7, 1999 and ending January 7, 2005.

*Person:* Any legal person, including any individual, corporation, partnership, joint venture, estate, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof, or any other entity.

*Predecessor Lease:* Has the meaning specified in Section 9.1(a).

*Prepayment:* With respect to any Collection Period for any Lease, a voluntary prepayment during such Collection Period of Scheduled Payments not yet due and owing under such Lease and without discount for payment in advance of the scheduled due dates.

*Principal Balance:* With respect to a Lease, as of any Accounting Date, the present value of the unpaid Scheduled Payments due after such Accounting Date and during or before the last Collection Period, discounted monthly at the Interest Rate (assuming, for purposes of such calculation, that each Scheduled Payment for each Collection Period is due on the Accounting Date within such Collection Period), plus Scheduled Payments due on or before such Accounting Date but not yet received as of such Accounting Date; provided, however, that for purposes of computing for a given Payment Date (as well as all Payment Dates thereafter), the Principal Balance of any Lease which became a Liquidated Lease during the related Collection Period or was required to be purchased by CMC or the Servicer as of the last day of the related Collection Period in accordance with Section 2.6, 3.2(f) or 3.4(g), will be deemed to be zero on and after the last day of such Collection Period.

*Proceeding:* Any suit in equity, action at law or other judicial or administrative proceeding.

*Purchase Amount:* With respect to a Purchased Lease the sum of all remaining Scheduled Payments for such Lease through the Accounting Date falling in the last Collection Period discounted to a present value at a rate equal to the rate on a U.S. Treasury Note of comparable maturity to Lease, unless otherwise agreed to by all parties, except with respect to past due Scheduled Payments.

C-42

*Purchased Lease:* As of any Deposit Date, any Lease and the other related Lease Assets which CMC or the Servicer has repurchased as of the related Accounting Date, as required by Section 2.6, 3.2(f) or 3.4(g).

*Purchaser:* Net.B@nk, A Federal Savings Bank

*Purchaser's Accounts:* The Collection Account and such other accounts as may be established in the name of the Purchaser pursuant to this Agreement.

*Related Documents:* Any documents appended hereto or referenced therein or herein. The Related Documents executed by any party are referred to herein as *"such party's Related Documents," "its Related Documents"* or by a similar expression.

*Representations and Warranties:* Has the meaning specified in Section 2.6.

*Residual Realizations:* Cash flows realized from the sale or re-lease of the Equipment following the scheduled expiration dates or early termination of the Leases, other than Equipment subject to Liquidated Leases.

*Responsible Officer:* When used with respect to the Servicer, the Seller or any other Person, the President, any Vice-President or Assistant Vice-President or the Controller of such Person, or any other officer or employee having similar functions.

*Schedule of Leases:* The schedule of Leases attached hereto as Exhibit A, as such schedule may be revised from time to time in accordance with Sections 2.6 and 9.2(a).

*Scheduled Payment:* With respect to any Collection Period for any Lease during the Original Term of such Lease, the required payment or payments due under such Lease for such Collection Period at any time on or after the Cut-Off Date, including any full or partial Prepayments of such required payment or payments, other than those portions of such payments which, (i) under such Lease, are to be applied by the Servicer to the payment of insurance charges, taxes and other similar obligations, or (ii) retained by the Servicer in payment of Administrative Fees or are late payments as to which Servicer Advances were made on a Payment Date. Scheduled Payments shall also include proceeds under the Surety Bonds in place of Scheduled Payments which otherwise would be made by the Obligors of Defaulted Leases.

*Seller:* COMMERCIAL MONEY CENTER, INC., a Nevada corporation, or its successor in interest pursuant to Section 6.2.

*Servicer:* SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation, its successor in interest and any successor Servicer under this agreement.

*Servicer Advance:* Has the meaning specified in Section 4.6.

*Servicer Standards:* Has the meaning specified in Section 2.2(d).

*Servicer Termination Event:* An event described in Section 8.1.

*Servicer's Report:* With respect to each Determination Date, a report, completed by and executed on behalf of the Servicer, in accordance with Section 3.9, substantially in the form attached hereto as Exhibit B.

C-43

*Servicing Account:* The account designated as such in, and established and maintained pursuant to, Section 4.8.

*State:* Any one of the 50 states of the United States of America, its territories and the District of Columbia.

*Stated Maturity Date:* January 7, 2005 (or, if such day is not a Business Day, the next succeeding Business Day thereafter).

*Sub-Servicer:* CMC, as Sub-Servicer, acting as and performing all duties referred to herein of the servicer, or any successor thereto, or any other Person named as servicer or sub-servicer in any agreement between the Servicer and such Person by which such Person is contractually obligated to perform on the Servicer's behalf all or a part of the servicing obligations described herein.

*Substitute Lease:* An Eligible Lease substituted by CMC for (a) a Liquidated Lease, (b) a Warranty Lease or (c) an Adjusted Lease, in accordance with Section 9.2.

*Surety Bond:* With respect to each Lease, a surety bond underwritten and validly issued by SAFECO INSURANCE COMPANY OF AMERICA or its successor, or one of its affiliates, in each instance reasonably acceptable to the Purchaser, or any of their successors, in each instance, which CMC or the Seller has: (i) purchased in order to protect against losses incurred due to default by the Lessee, and (ii) in which the Purchaser is named as loss payee, beneficiary or obligee.

*Termination Date:* The date on which the Purchaser shall have received payment and performance of all of the Lease Obligations.

*Transferred Assets:* Has the meaning specified in Section 2.1(a).

*UCC:* The Uniform Commercial Code as in effect in the relevant jurisdiction.

*Warranty Lease:* A Lease subject to repurchase by CMC pursuant to Section 2.6.

SECTION 1.2 **Usage of Terms.** With respect to all terms used in this Agreement, the singular includes the plural and the plural the singular; words importing any gender include the other gender; references to *"writing"* include printing, typing, lithography, and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Agreement; references to Persons include their permitted successors and assigns; and the terms *"include"* or *"including"* mean *"include without limitation"* or *"including without limitation."*

SECTION 1.3 **Calculations.** All calculations of interest shall be made on the basis of a 360-day year consisting of twelve 30-day months, except as otherwise may be provided herein. If the Monthly Total Distribution Amount is not paid in its entirety on the Stated Maturity Date, the balance remaining outstanding shall bear interest from and after such date at the Interest Rate. All distributions to the Purchaser until the Stated Maturity Date in respect of the Lease Obligations shall be applied first to the Interest Distributable Amount and then as principal to the Outstanding Principal Amount remaining immediately before such distribution; and any distributions to the Purchaser after the Stated Maturity Date

shall be applied first to accrued interest and then to the remaining outstanding balance of the final Monthly Total Distribution Amount remaining unpaid after the Stated Maturity Date.

SECTION 1.4 **Section References.** All references to Articles, Sections, paragraphs, subsections, exhibits and schedules shall be to such portions of this Agreement unless otherwise specified.

## ARTICLE II
## CONVEYANCE OF LEASES, CLOSING AND TERMINATION

SECTION 2.1 **Conveyance of Leases and Related Assets.** (a) Subject to the terms and conditions of this Agreement, the Seller, pursuant to the mutually agreed upon terms contained herein, hereby sells, transfers, assigns, and otherwise conveys to the Purchaser, without recourse (except as provided in this Agreement), as of the Closing Date, all of the right, title and interest, including any security interest, whether now owned or hereafter acquired, of the Seller in and to the following (the "Transferred Assets"):

(i) All contract rights under each Lease to receive all Scheduled Payments commencing with such payments due in the Collection Period commencing with the Initial Cut-Off Date and continuing thereafter for each succeeding Collection Period for the remaining lease period, including the foregoing first Collection Period (excluding those Scheduled Payments due prior to, but not received as of, the Cut-Off Date, but including those Scheduled Payments due on or after, but received prior to, the Cut-Off Date).

(ii) all funds on deposit from time to time in the Collection Account;

(iii) all rights under the Surety Bonds; and

(iv) any and all proceeds of the foregoing.

The foregoing does not constitute, nor is it intended to result in, the creation or assumption by the Purchaser of any obligation of the Seller, the Servicer or any other Person in connection with the Leases or the related Equipment or any agreement or instrument relating thereto, including any obligation to the Obligors.

(b) As security for the payment of the amounts described in clauses (i) through (iv) of Section 2.1(a), the Seller hereby grants to the Purchaser security interests in the following:.

(i) (A) the Leases, including, without limitation, (A) all monies at any time paid or payable thereon or in respect thereof from and after the Initial Cut-Off Date or, in the case of Substitute Leases, the applicable Cut-Off Date, including but not limited to (1) Scheduled Payments due after the Cutoff Date but not included in clause 2.1(a)(i) above, (2) Prepayments, (3) Liquidation Proceeds (including all net proceeds from the disposition of the related Equipment), (4) Extension Fees, (5) payments to be applied by the Servicer to the payment of insurance charges, taxes or other similar obligations and (6) payments to be retained by the Servicer in payment of Administrative Fees, (B) all of the right, title and interest, whether now owned or hereafter acquired, of the Seller in and to the Equipment and all proceeds thereof, all interests of the Seller, if any, in manufacturers' warranties in respect of the Equipment, all security interests of the lessor or the secured party, as the case may be, in the related Equipment and all present or future leases and other contracts relating to the Equipment and all revenues, payments, rights to payment, profits, accounts, chattel paper, products and contract rights arising from or related to the Equipment or

C-45

any use thereof or from any such lease or other contract, (C) all rights of the lessor or secured party, as the case may be, in all Insurance Policies, and any other security (other than any ownership interest of the lessor in the Equipment) for the payment of amounts due under the Leases (including all rights, if any, the lessor or the secured party may have against vendors and other third parties for payments of such amounts, and (D) all items contained in the related Lease Files and any and all other documents that are kept on file in accordance with CMC's customary procedures relating to the Leases;

      ii)  all funds on deposit from time to time in the Purchaser's Accounts to the extent not otherwise conveyed to Purchaser pursuant to Section 2.1(a);

      (iii)  any and all proceeds of the foregoing;

(c)  The execution and delivery of this Agreement shall constitute an acknowledgment by each of the Seller and the Purchaser that they intend that each assignment and transfer herein contemplated constitute a sale and assignment outright, and not for security, of the property described in Section 2.1(a), conveying good title thereto free and clear of any Liens, from the Seller to the Purchaser, and that all such property shall not be a part of the estate of the Seller in the event of the bankruptcy, reorganization, arrangement, insolvency or liquidation Proceeding, or other Proceeding under any federal or state bankruptcy or similar law, or the occurrence of another similar event, of, or with respect to the Seller.  In the event that such conveyance is determined to be made as security for a loan made by the Purchaser to the Seller, the Seller hereby grants to the Purchaser a first priority security interest in all of the Seller's right, title and interest in and to the property described in Section 2.1(a) to secure the loan determined to have been made to the Seller and the payment and performance of the other obligations of the Seller under this Agreement, and agrees that in such event this Agreement shall constitute a security agreement under applicable law.

SECTION 2.2  **Custody of Lease Files.**

(a)   The Purchaser hereby appoints the Servicer, and the Servicer hereby accepts such appointment, to act as the agent of the Purchaser, as custodian and bailee for the Purchaser of the following documents or instruments (with respect to each Lease), which will be, as of the Closing Date (or, in the case of a Substitute Lease, as of the date of substitution in accordance with Section 9.2), in the possession of the Servicer or its agents:

      (i)  the fully executed original of the Lease (together with any agreements modifying the Lease, including, without limitation, any extension agreements);

      (ii)  all documents related to the Leases;

      (iii)  documents evidencing or related to any Insurance Policy, or copies thereof;

      (iv) copies of all Surety Bonds or documents evidencing or related to the Surety Bonds (the original Surety Bonds to be delivered to and held by the Purchaser); and

      (iv) UCC filings or any other such documents, if any, that CMC keeps on file in accordance with its customary procedures indicating that the Equipment is owned or leased by the Obligor and subject to the interest of the lessor or secured party.



(b)  The Servicer and the Sub-Servicer agree to maintain the Lease Files in the offices of the Sub-Servicer at 221 West Crest Street, Suite 200, Escondido, California 92025, or at such other locations as shall from time to time be identified to the Purchaser and the Seller by advance written notice.  The Servicer may temporarily move individual Lease Files or any portion thereof without notice as necessary to conduct collection and other servicing activities in accordance with its customary practices and procedures.

(c)  As custodian, the Servicer shall have and perform the following powers and duties:

(i)  hold the Lease Files on behalf of the Seller and the Purchaser, maintain true, complete and accurate records pertaining to each Lease to enable it to comply with the terms and conditions of this Agreement and the Related Documents, maintain a current inventory thereof and certify to the Purchaser and the Seller annually that it continues to maintain possession of such Lease Files;

(ii)  implement written policies and procedures with respect to persons authorized to have access to the Lease Files and the receipting for Lease Files taken from their storage area by an employee of the Servicer for purposes of servicing or any other purposes; and

(iii)  attend to all details in connection with maintaining custody of the Lease Files on behalf of the Seller and the Purchaser.

(d)  In performing its duties under this Agreement, the Servicer agrees to service the Leases in accordance with customary and usual procedures of institutions which service equipment Leases, installment sale contracts, promissory notes, loan and security agreements and other similar types of receivables comparable to the Leases and, to the extent more exacting, the degree of skill and attention that the Servicer exercises from time to time with respect to all comparable such contracts that it services for itself or others (the "Servicer Standards").  The Servicer or the Sub-Servicer shall deliver any written servicing, maintenance or custodial policies, together with any amendments thereto, related to "Servicer Standards" to the Purchaser, with reasonable promptness after adoption of same.  The Servicer shall promptly report to the Seller and the Purchaser any failure by it to hold the Lease Files as herein provided and shall promptly take appropriate action to remedy any such failure.  In acting as custodian of the Lease Files, the Servicer agrees further not to assert any beneficial ownership interests in the Leases or the Lease Files.  The Servicer agrees to indemnify the Seller and the Purchaser for any and all liabilities, obligations, losses, damages, payments, costs or expenses of any kind whatsoever which may be imposed on, incurred or asserted against the Seller or the Purchaser as the result of any act or omission by the Servicer relating to the servicing, maintenance and custody of the Lease Files; provided, however, that the Servicer will not be liable, to the Seller or the Purchaser, respectively for any portion of any such amount resulting from the gross negligence or willful misconduct of the Seller or the Purchaser, respectively.

(e)  The Servicer shall act as the Purchaser's bailee of the original counterparts of each Lease and as such shall hold and distribute the original Leases as the Purchaser directs.

SECTION 2.3  **Further Assurances.**  Following the Closing Date, the Seller shall, at the reasonable request of the Servicer or the Purchaser and at the Seller's expense, execute and deliver any further instruments of transfer or other documents, and shall take all such other actions that may be necessary, appropriate or desirable, to fully convey the Transferred Assets to the Purchaser or otherwise to evidence, effectuate or implement the transactions contemplated hereby.  In addition, the Servicer, as agent for the Purchaser, shall defend the Transferred Assets against any and all claims and demands of all Persons at any time claiming the same or any interest therein adverse to that of the Purchaser.

C-47

SECTION 2.4  **Representations and Warranties of Seller.**  By its execution of this Agreement, the Seller makes the following representations and warranties.  Unless otherwise specified, such representations and warranties speak as of the Closing Date.

(a) <u>Organization and Good Standing</u>.  The Seller has been duly organized and is validly existing as a corporation in good standing under the laws of the State of Nevada, with power and authority to own its properties and to conduct its business as such properties are currently owned and such business is currently conducted, and had at all relevant times, and now has, power, authority and legal right to acquire, own and transfer the Leases and the other property transferred to the Purchaser.

(b) <u>Due Qualification</u>.  The Seller is duly qualified to do business as a foreign corporation in good standing, and has obtained all necessary licenses and approvals, in California and all other jurisdictions where the failure to do so would adversely affect the performance of its obligations under this Agreement and the Related Documents.

(c) <u>Power and Authority</u>.  The Seller has the power and authority to execute and deliver this Agreement and the Seller's Related Documents and to carry out the terms hereof and thereof; the Seller has full power and authority to transfer and assign the Transferred Assets and grant the security interests (as set forth in Section 2.1(b)) to be transferred and assigned to, granted to, and deposited with the Purchaser by it and has duly authorized such transfer and assignment and grant to the Purchaser by all necessary corporate action; and the execution, delivery and performance of this Agreement and the Seller's Related Documents have been duly authorized by the Seller by all necessary corporate and shareholder action.

(d) <u>No Consent Required</u>.  No consent, license, approval or authorization of, or registration or declaration with, any Person or any governmental authority, bureau or agency is required in connection with the execution, delivery or performance of this Agreement and the Related Documents, except for such as have been obtained, effected or made, all of which remain in effect and will remain in effect during the term of this agreement.

(e) <u>Valid Transfer; Binding Obligations</u>.  This Agreement effects, as of the Closing Date, a valid transfer and assignment of the Transferred Assets and grant of the security interests in the Lease Assets enforceable against the Seller and creditors of and purchasers from the Seller; and this Agreement and the Seller's Related Documents, when duly executed and delivered, shall constitute legal, valid and binding obligations of the Seller enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a Proceeding in equity or at law.

(f) <u>No Violation</u>.  The execution and delivery of this Agreement and the Related Documents, the consummation of the transactions contemplated by this Agreement and the Related Documents and the fulfillment of the terms of this Agreement and the Related Documents shall not conflict with, result in any breach of any of the terms and provisions of or constitute (with or without notice or lapse of time, or both) a default under the articles of incorporation or bylaws of the Seller, or any indenture, agreement, mortgage, deed of trust or other instrument to which the Seller is a party or by which it is bound, or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement, mortgage, deed of trust or other instrument, other than this Agreement, or violate any law, order, rule or regulation applicable to the Seller of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Seller or any of its properties.

C-48

(g) <u>No Proceedings</u>. There are no Proceedings or investigations pending or, to the Seller's knowledge, threatened against the Seller, before any court, regulatory body, administrative agency or other tribunal or governmental instrumentality having jurisdiction over the Seller or its properties (A) asserting the invalidity of this Agreement or any of the Related Documents, (B) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or any of the Related Documents, (C) seeking any determination or ruling that might materially and adversely affect the performance by the Seller of its obligations under, or the validity or enforceability of, this Agreement or any of the Related Documents, or (D) seeking to adversely affect (i) the federal income tax or other federal, state or local tax attributes of the Lease Obligations or Transferred Assets in relation to the Purchaser or (ii) the federal, state or local tax treatment of any of the transactions contemplated by this Agreement and the Related Documents.

(h) <u>Place of Business</u>. The principal executive offices of the Seller, are located at 101 Convention Center Drive, Las Vegas, Nevada 89109. and the offices where the Seller keeps its records concerning the Leases and related documents is 221 W. Crest Street, Suite 200 Escondido, CA 92025,

(i) Reserved.

(j) Reserved.

(k) <u>Good Title</u>. At the time of the sale, transfer and assignment of the Transferred Assets and grant of the security interests in the Lease Assets to the Purchaser pursuant to Sections 2.1(a) and 2.1(b), the Seller had good title to the Lease Assets and was the sole owner thereof (subject, in the case of amounts in the Insurance and Tax Accounts, to the rights of the Obligors therein), free of any Lien. Upon the sale, transfer and assignment of the Transferred Assets and security interests in the Lease Assets to the Purchaser pursuant to Sections 2.1(a) and 2.1(b), the Purchaser will have good title to the Transferred Assets or valid, enforceable security interests in the Lease Assets and will be the sole owner thereof (subject, in the case of amounts in the Insurance and Tax Accounts, to the rights of the Obligors therein), free of any Lien.

(l) <u>No Impairment</u>. No person has a participation in or other interest in or right to receive the Scheduled Payments under any Lease, and the Seller has taken no action to convey any right to any Person or permitted or suffered to exist, any condition that would result in such Person having a right to Scheduled Payments received with respect to any Lease.

(m) <u>Lawful Assignment</u>. No Lease was originated in, or is subject to the laws of, any jurisdiction the laws of which would make unlawful, void or voidable the sale, transfer and assignment of such Lease from the Seller to the Purchaser under this Agreement. Each Lease may be sold, assigned and transferred by the Seller to the Purchaser without the consent of, or prior approval from, or any notification to, the applicable Obligor.

(n) <u>All Filings Made</u>. All filings and other actions required to be made, taken or performed by any Person in any jurisdiction to give the Purchaser a first priority perfected Lien or ownership interest in the Leases and the Transferred Assets and a first priority perfected security interest in the Equipment have been made, taken or performed, including filings of financing statements under the Leases..

(o) <u>Schedule of Leases Accurate</u>. The information with respect to the Leases contained in the Schedule of Leases is true, complete and correct.

C-49

(p) <u>No Fraud</u>. By entering into all transactions contemplated by this Agreement there is no intent to hinder, delay or defraud any of the Seller's creditors.

(q) <u>Solvency</u>. Immediately prior to and immediately after each transfer of a Lease and the other related Lease Assets by the Seller, the Seller will be solvent, will have adequate capital to carry on its business, and intends to and will be able to pay its anticipated liabilities and debts as and when they become due.

SECTION 2.5 **RESERVED**

SECTION 2.6  **Repurchase of Leases Upon Breach of Representations and Warranties.** Subject to Section 3.3 (requiring that the first recourse with respect to a Defaulted Lease shall be to the related Surety Bond), as of the Deposit Date following its discovery by CMC or Seller or CMC's or Seller's receipt of notice from the Purchaser,  of any breach of the Representations and Warranties, unless such breach shall have been cured in all material respects, either (A) the Seller shall repurchase from the Purchaser the Transferred Assets related to the defaulted lease , or (B) the Seller shall substitute a Substitute Lease for such Lease and the related Equipment . On or before the Deposit Date on which such repurchase is required, Seller shall pay the Purchase Amount to the Servicer, for the benefit of the Purchaser, or substitute a Substitute Lease. It is understood and agreed that, except as set forth in the following paragraph, the obligation of the Seller  to repurchase or substitute another Lease for any Lease, together with the related Equipment, as to which a breach has occurred and is continuing shall, if such obligation is fulfilled, constitute the sole remedy against the Seller for such breach available to the Servicer on behalf of the Purchaser.  The provisions of this Section 2.6 shall survive the termination of this Agreement.

In addition to the foregoing and notwithstanding whether the Lease and related Equipment shall have been repurchased by the Seller, the Seller shall indemnify the Purchaser against all costs, expenses, losses, damages, claims and liabilities, including reasonable fees and expenses of counsel, which may be asserted against or incurred by any of them as a result of third party claims arising out of the events or facts giving rise to such breach.

SECTION 2.7  **Closing.** The Closing shall occur on the Closing Date.  At the Closing, the following shall concurrently occur:

(a)  The Seller shall deliver the original Lease files to the Servicer, which shall then deliver the original Lease Files to CMC as Sub-Servicer.

(b) The Seller shall deliver a matching copy of all of the Lease files to the Purchaser. The lease file shall contain a copy of the lease and related documents and the Original Surety Bond, Power of Attorney and Notary Acknowledgement.

(c) Any amounts received by the Seller before the Initial Cut-Off Date which constitute part of the Lease Obligations shall be paid in same day funds to the Purchaser.  Any amounts received by the Seller on or after the Initial Cut-Off Date and before the Closing Date which are Scheduled Payments or other amounts in respect of the Leases due before the Initial Cut-Off Date shall be paid to CMC.

(d) As the purchase price of the assets and rights herein conveyed to the Purchaser, the Purchaser shall wire funds equal to the Original Principal Amount to such account as Seller shall designate.



(e)  RESERVED

(f) The Seller and the Servicer shall respectively deliver such evidence of their corporate existence and authority as the Purchaser shall reasonably request.

(g) The Seller shall deliver to the Purchaser evidence, reasonably satisfactory to the Purchaser, of (A) the filing of all financing statements required under this Agreement, which financing statements (other than the financing statements filed in connection with the transfer of the Transferred Assets or with respect to the Leases) shall list the Purchaser as assignee of the security interests described therein; (B) a letter from the Surety Company acknowledging the valid issuance and delivery of the Surety Bonds.(C) the original of each executed Surety Bond with Power of Attorney and Notary attached, (D) an Opinion of Counsel and (E) a copy of each Lease.

(h)  RESERVED

(i)  Any other documents required hereunder shall be delivered to the appropriate parties.

SECTION 2.8  **Termination of this Agreement.**  This Agreement shall terminate upon the receipt by the Purchaser of the Original Principal Amount plus all Interest Distributable Amounts and, if the Monthly Total Distribution Amount is not paid in full on the Stated Maturity Date, interest accrued at the Interest Rate on such unpaid portion from and after the Stated Maturity Date.  Upon such termination, the Servicer shall be entitled to any amounts payable to it as provided herein.  Any remaining Transferred Assets shall thence be conveyed to the Seller without recourse.

SECTION 2.9  **Assignment or Transfer by the Purchaser of Transferred Assets and Security Interests.**  The Purchaser may assign or transfer the Transferred Assets and related security interests in part to another Person or Persons, retaining a portion of the Transferred Assets and related security interests, only to other financial institutions or accredited investors upon notice of such assignment or transfer to the other parties hereto; provided, however, that in such case, the terms of any such assignment or transfer shall be exclusively between the Purchaser and such assignees or transferees, and the other parties hereto shall not in any respect be obligated to, nor shall they be required to deal or communicate with, any such assignees or transferees.  This Agreement may be assigned by the Purchaser in whole but not in part to another financial institution upon notice to the other parties hereto.  Any such assignment or transfer of the Transferred Assets and related security interests or of this Agreement shall be duly reflected as a book entry on a register to be maintained by the Seller, identifying the owner of interests in such obligations, and the terms of any such transfer or assignment shall require all subsequent assignees and transferees to abide by the terms imposed upon the Purchaser in this Section 2.9, including reflection of all such transfers or assignment in such register.  Amounts due to Purchaser and its assignees shall be payable only to the owner or owners of the interests reflected in such book entries.  Any assignment or transfer of this Agreement or any of the Transferred Assets and security interests shall be in compliance with all applicable securities laws, and any such assignee or transferee shall be required to execute and deliver a purchaser's letter in substantially the form of the Purchaser's Letter to be delivered pursuant to Section 2.7(h).

SECTION 2.10  **Income Tax Characterization.**  This Agreement has been structured with the intention that the Lease Obligations will qualify under applicable federal, state, local and foreign tax law as indebtedness of the Seller secured by the Leases and other assets described in Section 2.1.  The parties hereto agree to treat and to take no action inconsistent with the treatment of the Lease Obligations as such indebtedness for purposes of federal, state, local and foreign income or franchise taxes and any other tax imposed on or measured by income.

C-51

### ARTICLE III
### ADMINISTRATION AND SERVICING OF LEASES

SECTION 3.1 **Duties of the Servicer.** The Servicer is hereby authorized and directed to act as agent, custodian and bailee for the Purchaser and the Seller and in such capacity shall manage, service, administer and make collections on the Leases, and perform the other actions required of the Servicer under this Agreement. The Servicer agrees that its servicing of the Leases shall be carried out in accordance with the Servicer Standards. The Servicer, upon notice to the Purchaser, may at any time change its customary standards, policies and procedures; provided, however, that any such change shall not vary from the Servicer Standards and shall not impair the collectibility of any Lease nor the Servicer's ability to perform its obligations under this Agreement and the Related Documents. The Servicer's duties shall include, without limitation, billing, collection and posting of all payments, responding to inquiries of Obligors on the Leases, investigating delinquencies, sending invoices to Obligors, accounting for collections, making distributions, disbursements and withdrawals from the Purchaser's Accounts as provided herein, and furnishing monthly and annual statements to the Purchaser and the Seller with respect to distributions, disbursements and withdrawals from the Purchaser's Accounts, monitoring the status of Insurance Policies with respect to the Equipment, monitoring the status of the Surety Bonds and performing the other duties specified herein. The Servicer shall also administer and enforce all material rights and responsibilities of the lessor or secured party under the Leases and provided for in the Insurance Policies, to the extent that such Insurance Policies relate to the Leases, the Equipment or the Obligors. To the extent consistent with the Servicer Standards or unless otherwise directed by the Purchaser, the Servicer shall have full power and authority to do any and all things in connection with such managing, servicing, administration, collection, distributing, disbursing and withdrawing that it may deem necessary or desirable, including the authority to forego collection efforts under circumstances deemed appropriate by the Servicer, provided that it may not take or fail to take actions if said taking or failure would limit or restrict Purchaser's rights to make claims and collect amounts due under any applicable Surety Bond. Without limiting the generality of the foregoing, the Servicer is hereby authorized and empowered by the Purchaser to execute and deliver, on behalf of the Seller and the Purchaser or either of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Leases and with respect to the Equipment in accordance with the Servicer Standards. The Servicer is hereby authorized to administer the Surety Bonds on behalf of the Purchaser, including giving notices and making claims under the Surety Bonds as directed by the Purchaser, provided that nothing contained herein shall preclude Purchaser from giving notices and making claims under the Surety Bonds in its own right. The Servicer is hereby authorized to commence, in its own name (or in the name of the Purchaser, provided the Servicer has obtained the Purchaser's consent, which consent shall not be unreasonably withheld), at its own expense, a legal Proceeding to enforce a Lease pursuant to Section 3.3 or to commence or participate in any other legal Proceeding (including, without limitation, a bankruptcy Proceeding) relating to or involving a Lease, an Obligor or the related Equipment. If the Servicer commences or participates in such a legal Proceeding in its own name, the Purchaser shall thereupon be deemed to have automatically assigned such Lease to the Servicer solely for the limited purposes of commencing or participating in any such Proceeding as a party or claimant, and the Servicer is authorized and empowered by the Purchaser to execute and deliver in the Servicer's name any notices, demands, claims, complaints, responses, affidavits or other documents or instruments in connection with any such Proceeding.

SECTION 3.2 **Collection of Lease Payments; Modifications of Leases.**

(a) Consistent with the standards, policies and procedures required by this Agreement, the Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of

C-52

the Leases as and when the same shall become due, and shall follow such collection procedures as are in accordance with the Servicer Standards and otherwise act with respect to the Leases, the related Equipment, the Insurance Policies, the Surety Bonds and the other Lease Assets in such manner as will, in the reasonable judgment of the Servicer, maximize the amount to be received by the Purchaser and the Seller with respect thereto.  The Servicer is authorized in its discretion to waive any Administrative Fees or Extension Fees that may be collected in the ordinary course of servicing any Lease.

(b)  The Servicer may at any time agree to a modification or amendment of a Lease in accordance with its credit and collection policies and procedures (it being acknowledged that any modification or amendment of a Lease resulting from a bankruptcy Proceeding with respect to the Obligor will not be deemed to have been agreed to by the Servicer hereunder):

(i)  in order to change the Obligor's regular due date to another date within the Collection Period in which such due date occurs, or

(ii)  for any other purpose, provided that no such modification or amendment shall:
(A)  change the amount or the due date of any Scheduled Payment (except as provided in clause (i) above, Section 3.2(c) or Section 3.2(d)),

(B)  release the related Equipment from the Lease, unless equipment of equal or greater value is substituted and lien therein perfected;

(C)  cause any of the representations or warranties contained in the Representations and Warranties to cease to be true, complete and accurate; or

(D)  except as provided in clause (ii)(A) above, result in the Principal Balance or Required Payoff Amount of the Lease being less than it would have been absent such modification or amendment; or

(E)  adversely affect or release the Surety Bond or the Purchaser's rights thereunder.

(c)  Subject to the limitations of (b)(ii) above, the Servicer may grant payment extensions on a Lease in accordance with its credit and collection policies and procedures (it being acknowledged that any extensions on a Lease resulting from a bankruptcy Proceeding with respect to the Obligor will not be deemed to have been granted by the Servicer hereunder) if the Servicer believes in good faith that such extension is necessary to avoid a termination and liquidation of such Lease and will maximize the amount to be received by the Purchaser with respect to such Lease; provided, however, that:

(i)  the aggregate period of all extensions granted on a Lease shall not exceed six months; and

(ii)  in no event may any Lease be extended beyond six months of the Collection Period immediately preceding the final Stated Maturity Date; and

(iii)  in no event shall such extension change the Monthly Base Distribution Amount to be received by the Purchaser.

Nothing in this Section 3.2(c) shall be deemed to prevent the Servicer from extending or renewing, or otherwise accepting the continued performance by the Obligor under, a Lease after expiration of its stated term.

C-53

(d) The Servicer may, in its discretion, allow a Prepayment, in whole or in part, of any Lease which, by its terms, is not prepayable; provided, however, that such Prepayment shall not extend the due dates for the Scheduled Payments next coming due or diminish the total amounts due under the Lease

(e) The Servicer, the Seller and CMC, respectively, shall remit or cause to be remitted all payments by or on behalf of the Obligors (other than amounts constituting Administrative Fees) received by the Servicer, the Seller or CMC, as the case may be, constituting those funds required to be collected by the Servicer hereunder, directly to the Servicing Account. Any funds otherwise received shall be deposited to the Servicing Account, as soon as practicable, but in no event later than the second Business Day after receipt thereof in the event funds are received into an account other than the Servicing Account.

(f) If the Servicer agrees to a modification, amendment or extension of a Lease not permitted by Sections 3.2(b) or 3.2(c), the Servicer shall, on the next Deposit Date, either (i) repurchase such Adjusted Lease in accordance with Section 2.6, or (ii) deliver a Substitute Lease therefor in accordance with Article IX.

SECTION 3.3 **Realization Upon Leases.** (A) The Servicer shall, as its first recourse with respect to any Lease as to which the Obligor is in default, when such Lease becomes a Defaulted Lease, realize upon and collect the proceeds in respect of the Surety Bond; and in the event the insurance carrier pays under the Surety Bond in full as provided therein, then in such event the Servicer, the Seller and the Purchaser shall convey to such carrier all rights and obligations in and to the Defaulted Leases and related Equipment to such carrier. Otherwise, consistent with the standards, policies and procedures required by this Agreement, the Servicer shall take such action as is reasonably necessary (including making commercially reasonable efforts to repossess (or otherwise comparably convert the ownership of) and dispose of the related Equipment) to collect from the Obligor or otherwise all amounts payable under any Lease as to which the Obligor is in default in the making of one or more Scheduled Payments thereunder, if the Servicer has determined such default is not likely to be cured.  Unless otherwise directed by the Purchaser or its assigns , the Servicer will not be required to repossess (or otherwise comparably convert the ownership of) any Equipment the repossession of which, in accordance with the Servicer Standards, and based on the Servicer's good faith estimate of the value of the Equipment and its availability, would not be reasonable.  Unless otherwise directed by the Purchaser or its assigns,  the Servicer is authorized to follow such customary practices and procedures as it shall deem necessary or advisable, consistent with the Servicer Standards, which practices and procedures may include the sale of the related Equipment at public or private sale, the submission of claims under an Insurance Policy and other actions by the Servicer in order to realize upon such a Lease. The foregoing is subject to the provision that, in any case in which the Equipment shall have suffered damage, the Servicer shall not expend funds in connection with any repair or towards the repossession of such Equipment unless it shall determine in its reasonable judgment that such repair and/or repossession shall increase the proceeds of liquidation of the related Lease by an amount greater than the amount of such expenses.  All amounts received upon liquidation of a Lease (except as otherwise provided below), including any proceeds derived from the disposition of the related Equipment, shall be remitted by the Servicer to the Servicing Account as soon as practicable, but in no event later than the second Business Day after receipt thereof.  The Servicer shall, in accordance with Section 3.4(f), pay on behalf of the Purchaser and the Seller any sales, use, personal property and other taxes assessed on repossessed Equipment, as well as any sales or similar taxes on the disposition thereof, and shall be entitled to reimbursement of any such tax by CMC, if CMC is no longer acting as Sub-Servicer as provided in Section 3.8 herein. Nothing contained in this Section 3.3 shall preclude or limit the Purchaser's rights to make a claim and collect amounts due under any Surety Bond with respect to any Defaulted Lease.

SECTION 3.4  **Insurance and Taxes.**

(a)  The Servicer shall establish one or more insurance and tax accounts (collectively, the "Insurance and Tax Accounts") in the name of the Servicer and for the benefit of the respective Obligors and, to the extent provided herein, the Purchaser and the Seller.  The Servicer shall deposit into the Insurance and Tax Accounts any payments made by or on behalf of Obligors which constitute (i) insurance charges paid by an Obligor to the lessor or secured party under a Lease, (ii) any insurance payments or recoveries paid by an insurance company or comparable third party and related to the damage to, or destruction of, the Equipment related to such Lease (unless paid directly by such insurance company or comparable third party directly to the Obligor) and (iii) taxes paid by the Obligor with respect to the related Lease or Equipment (except for any such payments in respect of taxes which were paid by CMC prior to the Cut-Off Date, which payments shall constitute Scheduled Payments hereunder).  None of the foregoing payments shall constitute Pledged Revenues except under the circumstances described in clause (c)(ii) below.

(b)  The Servicer may pay from its own funds, or may withdraw amounts from the Insurance and Tax Accounts, when and if appropriate, to pay, when due (i) all insurance charges in the amounts received under clause (a)(i) above and (ii) all taxes in the amounts received under clause (a)(iii) above.  If the Servicer has paid any such insurance charges or taxes from its own funds (including any such amounts that may have been paid prior to the Closing Date it shall provide written notice thereof to the Purchaser), the Servicer shall be entitled to reimbursement therefor from the Seller or from any appropriate amounts available therefor in the Insurance and Tax Accounts or from payments thereafter received from the applicable Obligor in respect thereof.  The Servicer is authorized in its discretion to waive its right to receive reimbursement of any such amount.

(c)  Amounts on deposit in the Insurance and Tax Accounts which represent amounts received by the Servicer pursuant to clause (a)(ii) above shall be applied by the Servicer as follows:  (i) if equipment is purchased to replace the Equipment that was damaged or destroyed, and such replacement equipment is (in the reasonable opinion of the Servicer) of comparable use and equivalent value to the Equipment that was damaged or destroyed, or if the Equipment has been repaired, the Servicer shall release such amount so received from the insurance company or comparable third party in payment or reimbursement for such replacement equipment or such repair; and (ii) if such replacement option is not exercised or the Equipment is not to be repaired, then the Servicer shall treat such amount as Liquidation Proceeds (after netting any amounts therefrom as is provided pursuant to the definition of "Liquidation Proceeds" herein) and transfer such amount from the Insurance and Tax Accounts to the Collection Account.

(d)  With the Purchaser's consent, the Servicer may sue to enforce or collect upon the Insurance Policies, in its own name, if possible, or as agent of the Purchaser and the Seller.  If the Servicer elects to commence a legal Proceeding to enforce an Insurance Policy, the act of commencement shall be deemed to be an automatic assignment of the rights of the Purchaser and the Seller under such Insurance Policy to the Servicer for purposes of collection only.  If, however, in any enforcement suit or legal Proceeding it is held that the Servicer may not enforce an Insurance Policy on the grounds that it is not a real party in interest or a holder entitled to enforce the Insurance Policy, the Purchaser, on behalf of the Seller, and at Seller's or Servicer's sole expense, shall take such steps as the Servicer deems necessary to enforce such Insurance Policy, including bringing suit in its name or the name of the Servicer for the benefit of the Purchaser.

(e)  Consistent with the Servicer Standards, with respect to each Lease, the Servicer shall maintain insurance against casualty loss and liability insurance with respect to any Equipment financed by or leased pursuant to the Lease, to the extent the Lease requires the lessor or secured party under the Lease to


C-65

maintain such insurance, and shall otherwise require the Obligor under the Lease to maintain such insurance and shall require that each Obligor lessee provide such written certification as the Servicer or its assigns may reasonably require that such insurance is being maintained and is in force, to the extent the Lease requires that such insurance be maintained by the Obligor. The Servicer shall not otherwise be liable to the Purchaser or the Seller for any casualty loss with respect to any Equipment related to a Lease, except to the extent otherwise explicitly provided in this Agreement.

(f)  The Servicer shall determine and pay when due all sales, use, personal property and other taxes payable in respect of the Equipment related to each Lease. To the extent the Servicer has previously received from the related Obligor payments with respect to such taxes and has deposited such payments in the Insurance and Tax Accounts in accordance with clause (a)(iii) above, the Servicer shall, in accordance with clause (b)(ii) above, either (i) pay such taxes from amounts withdrawn from the Insurance and Tax Accounts, or (ii) pay such taxes from its own funds and thereafter reimburse itself from amounts withdrawn from the Insurance and Tax Accounts. In the event the Servicer has not previously received payments from the Obligor for this purpose, or to the extent any such payments received were insufficient to pay the taxes due, the Servicer shall nonetheless pay such taxes from its own funds and shall bill the Obligor for any amounts so paid. The Servicer shall be entitled to reimbursement for any taxes so paid from its own funds, as provided in clause (b)(ii) above. Failure on the part of the Servicer to perform its duties in a timely fashion under this clause shall constitute a breach of this Agreement by the Servicer for which indemnity will be available in accordance with Section 7.1.

(g)  The Servicer shall give prompt written notice to the Purchaser and the Seller of the Servicer's failure to pay when due any insurance charge or tax payment required to be paid pursuant to this Section 3.4 and the reason for such failure. If the Servicer fails to give such notice, it shall, as of the second Payment Date following such failure, either (i) purchase such Lease in accordance with Section 2.6 or (ii) provide a Substitute Lease therefore in accordance with Article IX. Upon receipt of any such notice, or if the Servicer has otherwise received notice of any such failure to pay an insurance charge or tax payment, the Servicer shall take such actions as are reasonably necessary (including the withdrawal of monies, if any, available therefor in the Insurance and Tax Accounts and attributable to payments previously made by the related Obligor and payment of such insurance charge or tax payment) to cause any such amounts to be paid. The Servicer shall be permitted to withdraw monies from the Insurance and Tax Accounts for purposes of performing its obligations under this paragraph, and otherwise shall, if necessary, use its own funds for such purposes, said funds to be reimbursed to the Servicer, from sources other than the Purchaser.

SECTION 3.5  **[Reserved].**

SECTION 3.6  **Covenants, Representations, and Warranties of Servicer.** By its execution and delivery of this Agreement, the Servicer makes the following representations, warranties and covenants.

(a)  The Servicer covenants as follows:

(i)  Liens in Force. The Equipment securing each Lease shall not be released or discharged in whole or in part from any interest the lessor or secured party may have in such Equipment under the terms of the Lease, except upon payment in full of the Lease or as otherwise contemplated herein;

(ii)  No Impairment. The Servicer shall do nothing, by act or omission, to impair the rights of the Purchaser or the Seller in the Leases, the Insurance Policies or the other Lease Assets or Surety Bonds; and

C-56

(iii) <u>No Amendments</u>. The Servicer shall not extend or otherwise amend the terms of any Lease with respect to the Scheduled Payments thereon, except (A) in accordance with Section 3.2, or (B) at such time as the Lease Obligations have been paid in full to the Purchaser.

(b) The Servicer represents, warrants and covenants as of the date of execution and delivery of this Agreement:

(i) <u>Organization and Good Standing</u>. The Servicer has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of organization, with power, authority and legal right to own its properties and to conduct its business as such properties are currently owned and such business is currently conducted, and had at all relevant times, and now has, power, authority and legal right to enter into and perform its obligations under this Agreement and the Servicer's Related Documents;

(ii) <u>Due Qualification</u>. The Servicer is duly qualified to do business as a foreign corporation in good standing, and has obtained all necessary licenses and approvals, in all jurisdictions where the failure to do so would materially and adversely affect the performance of its obligations under this Agreement and the Related Documents;

(iii) <u>Power and Authority</u>. The Servicer has the power and authority to execute and deliver this Agreement and to carry out the terms hereof; and the execution, delivery and performance of this Agreement and the Servicer's Related Documents have been duly authorized by the Servicer by all necessary corporate action;

(iv)    <u>Binding Obligation</u>. This Agreement and the Servicer's Related Documents shall each constitute the legal, valid and binding obligation of the Servicer enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a Proceeding in equity or at law;

(v) <u>No Violation</u>. The execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and the Servicer's Related Documents, and the fulfillment of the terms hereof, shall not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time, or both) a default under, the articles of incorporation or bylaws of the Servicer, or any indenture, agreement, mortgage, deed of trust or other instrument to which the Servicer is a party or by which it is bound, or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement, mortgage, deed of trust or other instrument, other than this Agreement or any Related Document, or violate any law, order, rule or regulation applicable to the Servicer of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Servicer or any of its properties;

(vi)  <u>No Proceedings</u>.  There are no Proceedings or investigations pending or, to the Servicer's knowledge, threatened against the Servicer, before any court, regulatory body, administrative agency or other tribunal or governmental instrumentality having jurisdiction over the Servicer or its properties (A) asserting the invalidity of this Agreement or any of the Servicer's Related Documents, (B) seeking to prevent the issuance of the Lease Obligations or the

consummation of any of the transactions contemplated by this Agreement or any of the Servicer's Related Documents, (C) seeking any determination or ruling that might materially and adversely affect the performance by the Servicer of its obligations under, or the validity or enforceability of, this Agreement or any of the Servicer's Related Documents or (D) seeking to adversely affect (i) the federal income tax or other federal, state or local tax attributes of the Lease Obligations or Transferred Assets in relation to the Purchaser or (ii) the federal, state or local tax treatment of any of the transactions contemplated by this Agreement and the Related Documents; and

(vii) <u>No Consents</u>. The Servicer is not required to obtain the consent of any other party or any consent, license, approval or authorization, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Servicer's Related Documents.

SECTION 3.7    **Sub-Servicers.**  CMC is hereby appointed to be the initial Sub-Servicer and assumes all responsibility, as agent for and on behalf of the Servicer, to perform the duties of the Servicer hereunder.  The Servicer may otherwise, with the Purchaser's consent, which shall not be unreasonably withheld, maintain or enter into one or more agreements with Sub-Servicers for the servicing and administration of the Leases by such Sub-Servicers. Notwithstanding the terms or existence of any such agreement between the Servicer and a Sub-Servicer, including CMC, the Servicer shall not be relieved of any of its obligations under this Agreement by reason of such agreement and shall be obligated to the same extent and under the same terms and conditions as if the Servicer alone was servicing and administering the Leases, and neither the Purchaser nor the Seller shall have any obligation to deal with anyone other than the Servicer with respect to the servicing of the Leases; provided, however, that so long as CMC shall be the Sub-Servicer hereunder, the Purchaser and the Seller agree to deal directly with CMC as Sub-Servicer as CMC or the Servicer may reasonably request, but without in any way, releasing Servicer as primary obligor hereunder.

SECTION 3.8 **Expenses of Servicer.**  Except for reimbursable expenses as otherwise provided herein, the Servicer shall be required to pay all expenses incurred by it in connection with its activities under this Agreement (including taxes imposed on the Servicer and all expenses incurred in connection with reports to the Purchaser).  Purchaser has no responsibility for any Servicing costs whatsoever.

SECTION 3.9 **Servicer's Report.**  No later than 10:00 a.m. Nevada time on each Payment Date, the Servicer shall deliver to the Purchaser and the Seller a Servicer's Report executed by a Responsible Officer of the Servicer containing, among other things, (i) all information necessary to enable the Servicer to make the withdrawals and distributions required by Section 4.7, (ii) all information necessary to enable the Servicer to reconcile all deposits to, and withdrawals from, the Servicing Account, and  the Collection Account and the Insurance and Tax Accounts for the related Collection Period and Payment Date, including the accounting required by Section 4.5 and (iii) all information necessary to enable Purchaser to complete and submit a Bond Default Notice.  Leases repurchased (or for which a Substitute Lease was substituted) by CMC or the Servicer on the related Deposit Date and each Lease which became a Liquidated Lease or which was paid in full during the related Collection Period, shall be identified by account number (as set forth in the Schedule of Leases), and information regarding each Substitute Lease shall be provided.

SECTION 3.10   SECTION 3.10 **Annual Statement as to Compliance; Servicer Termination Event Notice.**

(a) The Servicer shall deliver to the Purchaser and the Seller on or before March 31 of each year, beginning on March 31, 2000, a certificate signed by any Responsible Officer of the Servicer, dated as of

December 31 of the immediately preceding year, stating that (i) a review of the activities of the Servicer during the preceding 12-month period (or such other period as shall have elapsed from the Closing Date to the date of the first such certificate) and of its performance under this Agreement has been made under such officer's supervision, and (ii) to such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such period, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof.

(b)  The Servicer shall deliver to the Purchaser and the Seller, promptly after having obtained knowledge thereof, but in no event later than two Business Days thereafter, written notice in a certificate signed by any Responsible Officer of the Servicer of any event which with the giving of notice or lapse of time, or both, would become a Servicer Termination Event under Section 8.1(a).  The Servicer shall deliver to the Purchaser and the Seller, promptly after having obtained knowledge thereof, but in no event later than three Business Days thereafter, written notice in a certificate signed by any Responsible Officer of the Servicer of any event which with the giving of notice or lapse of time, or both, would become a Servicer Termination Event under any other clause of Section 8.1.

(c)  The Servicer shall furnish to the Purchaser:

(i)  as soon as available and in any event not later than 90 days after the end of each fiscal year of the Servicer, a copy of the annual audit report for such year for the Servicer, including therein a consolidated balance sheet of the Servicer as of the end of such fiscal year and consolidated statements of income, cash flows and retained earnings of the Servicer for such fiscal year, in each case certified by a firm of independent certified public accountants (which firm shall be approved by the Purchaser, and such approval shall not be unreasonably withheld) and including any management letters delivered by such accountants to the Servicer in connection with such audit together with a certificate of such accounting firm to the Purchaser stating that, in the course of a regular audit of the business of the Servicer, which audit was conducted by such accounting firm in accordance with generally accepted auditing standards, such accounting firm has obtained no knowledge that a Servicer Termination Event has occurred and is continuing, or if, in the opinion of such accounting firm, a Servicer Termination Event has occurred and is continuing, a statement as to the nature thereof; and

(ii)  as soon as available and in any event not later than 90 days after the end of each of the first three quarters of each fiscal year of the Servicer, the unaudited consolidated balance sheet of the Servicer as of the end of such quarter and the consolidated statements of income, cash flows and retained earnings of the Servicer for the period commencing at the end of the previous year and ending with the end of such quarter, all in reasonable detail and duly certified with respect to such consolidated statements (subject to year-end audit adjustments) by the chief financial officer or chief accounting officer of the Servicer as having been prepared in accordance with generally accepted accounting principles.

SECTION 3.11  **Annual Independent Accountants' Report.**

(a)  The Servicer shall cause a firm of independent certified public accountants (which firm shall be approved by the Purchaser, and such approval shall not be unreasonably withheld) (the "Independent Accountants"), who may also render other services to the Servicer, to deliver to the Purchaser and the Seller on or before March 31 of each year, beginning on March 31, 2000, with respect to the twelve months ended the immediately preceding December 31 (or such other period as shall have elapsed from the Closing Date to the date of such certificate), a statement (the "Accountant's Report") addressed to the

Board of Directors of the Servicer, to the Purchaser and to the Seller, to the effect that such firm has audited the financial statements of the Servicer and issued its report thereon and that such audit was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as such firm considered necessary in the circumstances, including procedures as determined by the Independent Accountants related to (i) the documents and records concerning the servicing of equipment lease contracts, installment sale contracts, promissory notes, loan and security agreements and/or other similar types of receivables under servicing agreements substantially similar one to another (such Accountant's Report to have attached thereto a schedule setting forth the servicing agreements covered thereby, including this Agreement); and (ii) the delinquency and loss statistics relating to the Servicer's portfolio of equipment lease contracts, installment sale contracts, promissory notes, loan and security agreements and/or other similar types of receivables; and except as described in the Accountant's Report, disclosed no exceptions or errors in the records relating to the contracts serviced for others that, in the firm's opinion, generally accepted auditing standards requires such firm to report. The Accountant's Report shall further state that (1) a review of certain agreed upon procedures was performed with respect to two randomly selected Servicer's Certificates during the applicable period, and (2) except as disclosed in the Report, no exceptions or errors in the Servicer's Certificates so examined were found.

(b)  The Accountants' Report shall also indicate that the firm is independent of the Seller and the Servicer within the meaning of the Code of Professional Ethics of the American Institute of Certified Public Accountants.

SECTION 3.12  **Access to Certain Documentation and Information Regarding Leases.**  The Servicer shall provide to representatives or regulators or auditors of the Purchaser and the Seller reasonable access to the documentation regarding the Leases.  In each case, such access shall be afforded without charge but only upon reasonable request and during normal business hours.  Nothing in this Section shall derogate from the obligation of the Servicer to observe any applicable law, rule or contractual provision with an Obligor prohibiting disclosure of information regarding the Obligors, and the failure of the Servicer to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section.

SECTION 3.13  **Protection of Lease Assets.**  The parties intend the security interests conveyed pursuant to this Agreement in favor of the Purchaser to be prior to all other Liens in respect of the Lease Assets, and the Seller or Servicer, as the case may be, shall take all actions necessary to obtain and maintain, in favor of the Purchaser, a first Lien on and a first priority, perfected security interest in the Lease Assets.  The Seller or Servicer, as the case may be, will from time to time execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, all as prepared by the Servicer and delivered to the Purchaser, and will take such other action necessary or advisable to:

(a)  sell, assign or convey more effectively all or any portion of the Transferred Assets or security interests in the Lease Assets, as the case may be;

(b)  maintain or preserve the Liens and security interests (and the priority thereof) in favor of the Purchaser created by this Agreement or carry out more effectively the purposes hereof;

(c)  perfect, publish notice of or protect the validity of any sale, assignment or conveyance made or to be made by this Agreement;

C-60

(d)  enforce any of the Leases and each other instrument or agreement included in the Lease Assets; or

(e)  preserve and defend title to the Lease Assets and the rights of the Purchaser in such Lease Assets against the claims of all persons and parties.

The Purchaser and the Seller hereby designate the Servicer their agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required by the Purchaser pursuant to this Section 3.13.

## ARTICLE IV
## COLLECTIONS, DEPOSITS, PURCHASER'S ACCOUNTS, DISBURSEMENTS AND RELEASES

SECTION 4.1  **Collection Account.**  On or prior to the Closing Date, the Servicer shall establish the Collection Account in the name of the Purchaser.  The Collection Account shall be an Eligible Account, under the dominion and control of the Purchaser but subject to the Servicer's rights and obligations hereunder, into which the Servicer shall deposit or cause to be deposited all amounts described in Section 4.3.

SECTION 4.2  **Initial Deposit.**  On the Closing Date, the Servicer, CMC or the Seller, as the case may be, shall deposit in the Servicing Account all Scheduled Payments with respect to Scheduled Payments due on or after the Initial Cut-Off Date and received by the Servicer, CMC or the Seller, as the case may be, on or prior to the Business Day immediately preceding such date.

SECTION 4.3  **Collections.**

(a)  Pursuant to Section 4.8, the Servicer has established the Servicing Account.  The Servicer shall make deposits to and transfers from the Servicing Account, and shall be entitled to make withdrawals therefrom, as provided in this Agreement.  The Servicer shall cause to be remitted directly to the Servicing Account all payments by or on behalf of the Obligors on the Leases (other than amounts constituting Administrative Fees and except as otherwise provided herein), received by the Servicer.  Within three days after receipt by the Servicer in the Servicing Account, the Servicer shall transfer all amounts credited to the Servicing Account on account of such payments and proceeds to the extent they constitute Scheduled Payments, to the Collection Account.  Notwithstanding the foregoing, the Servicer may utilize an alternative remittance schedule acceptable to the Purchaser.

(b)  The Servicer shall remit to the Collection Account no later than the Deposit Date related to a Payment Date, any Purchase Amount received by the Servicer upon the repurchase by the Seller or the Servicer of any Lease pursuant to Section 2.6, 3.2(f) or 3.4(g).

(c)  Notwithstanding the provisions of subsections (a) and (b) hereof, so long as the Servicer is not in default hereunder, the Servicer will be entitled to be reimbursed from amounts on deposit in the Servicing Account with respect to a Collection Period for amounts previously deposited in the Servicing Account but later determined by the Servicer in good faith to (i) have resulted from mistaken deposits or postings  The amount to be reimbursed hereunder may be retained pursuant to Section 4.5 at any time or may otherwise be paid to the Servicer on the related Payment Date pursuant to Section 4.7(e) upon certification by the Servicer of such amounts and the provision of such information to the Purchaser as may be necessary or as may be requested by the Purchaser to verify the accuracy of such certification.

C-61

SECTION 4.4 **Application of Collections.** For the purposes of this Agreement, all collections for a Collection Period shall be applied by the Servicer as follows:

(a)  With respect to each Lease, payments by or on behalf of the Obligor thereof (other than Administrative Fees with respect to such Lease, to the extent collected) shall be applied to Scheduled Payments and Prepayments in accordance with the terms of such Lease and the Servicer Standards. With respect to each Liquidated Lease, the Liquidation Proceeds shall be applied, for purposes of this Agreement only, to Scheduled Payments and Prepayments on the Lease as if the Liquidation Proceeds had been paid by the Obligor on the Accounting Date, and then to any other amounts due and payable with respect to such Lease. The Servicer shall not be entitled to any Administrative Fees with respect to a Liquidated Lease unless the Required Payoff Amount for such Lease has been deposited in the Collection Account.

(b)  With respect to each Lease that has become a Purchased Lease as of any Deposit Date, the Purchase Amount shall be applied, for purposes of this Agreement only, to Scheduled Payments on the Lease as if the Purchase Amount had been paid by the Obligor on the related Accounting Date. All payments by or on behalf of an Obligor received with respect to any Purchased Lease after the Accounting Date immediately preceding the Deposit Date on which the Purchase Amount was paid by Seller , shall be paid to Seller and shall not be included in the Amount Available for subsequent Payment Dates.

SECTION 4.5 **Net Deposits.** So long as no Servicer Termination Event shall have occurred and be continuing with respect to the Servicer, the Servicer may make the remittances or transfers to be made by it pursuant to Section 4.3 net of amounts (which amounts may be netted prior to any such remittance or transfer) that would otherwise be distributed to it pursuant to Section 4.7(e); provided, however, that the Servicer shall account for all of such amounts in the related Servicer's Report as if such amounts were deposited and distributed separately.  If an error is made by the Servicer in calculating the amount to be deposited or retained by it, with the result that an amount less than required is deposited in the Collection Account, the Servicer shall make a payment of the deficiency to the Collection Account immediately upon becoming aware of such error.

SECTION 4.6 **Servicer Advances.**  On each Deposit Date, the Servicer may, but will not be required to, advance and remit to the Collection Account, in such manner as will ensure that there will be immediately available funds in the account on the related Payment Date, an amount (a "Servicer Advance") equal to any Scheduled Payments due during the prior Collection Period but unpaid prior to such Deposit Date with respect to any Lease. In consideration of each Servicer Advance the Servicer will be entitled to retain any late payment fees recovered from the Obligor with respect to any Lease Payment covered by a Servicer Advance. In addition, the Servicer will be reimbursed for Servicer Advances from funds in the Servicing Account in accordance with Section 4.7(e) on the second day following Payment Date.

SECTION 4.7 **Distributions.**  On each Payment Date, the Servicer shall;

(a) distribute the Monthly Total Distribution Amount, from the Collection Account to the Purchaser by wire transfer to the account designated by the Purchaser in writing from time to time; and

(b) to the extent then due to insurers and taxing authorities, distribute Insurance and Tax collections on deposit in the Insurance and Tax Account from the related Collection Period or Periods to appropriate entities in accordance with applicable laws and regulations;

(c) distribute Liquidation Proceeds on deposit in the Servicing Account or the Collection Account from the related Collection Period (i) to the Seller in the event of a Substituted Lease or (ii)  to the

C-62

Purchaser in the event of a Purchased Lease

(d) distribute to the Servicer or its Sub-Servicer any Administrative Fees on deposit in the Servicing Account from the related Collection Period;

(e) distribute to the Servicer or the Sub-Servicer any amounts on deposit in the Servicing Account that have been previously advanced by the Servicer to the Purchaser or the Seller. This includes payments received from Surety Bond claims paid on Defaulted Leases for which payments were advanced to the Purchaser by the Servicer on previous Payment Dates.

SECTION 4.8 **Servicing Account.** On or prior to the Closing Date, the Servicer shall establish the Servicing Account in the name of the Servicer for the benefit of the Purchaser and the Seller. The Servicing Account shall be an Eligible Account under the dominion and control of the Servicer. The Servicer shall deposit or cause to be deposited in the Servicing Account all amounts described in Sections 4.2 and 4.3, subject to Section 4.5. The Servicer shall make transfers from the Servicing Account, and shall be entitled to make withdrawals from the Servicing Account, only as provided herein.

SECTION 4.9 **RESERVED**

SECTION 4.10 **RESERVED**

SECTION 4.11 **General Provisions Regarding Servicing Account and Collection Account**

(a) All amounts held in the Servicing Account, and the Collection Account shall, to the extent permitted by applicable laws, rules and regulations, be invested, in Eligible Investments. With respect to the Collection Account, Eligible Investments shall be made in the name of the Servicer on behalf of the Purchaser.

(b) The Servicer, in holding all funds in the Servicing Account and the Collection Account, and in making distributions as provided in this Agreement, shall act solely on behalf of and as agent for the Purchaser and/or the Seller, as the case may be.

(c) Any account which is required to be established as an Eligible Account pursuant to this Agreement and which ceases to be an Eligible Account shall within five Business Days (or such longer period, not to exceed 30 days, as to which the Purchaser may consent) be established by the Servicer as a new account which shall be an Eligible Account, and any cash and/or any investments shall be transferred to such new account.

(d) The Servicer shall not commingle any of its funds or funds from any source other than the sources provided in this Agreement with the funds in the Purchaser's Accounts.

**ARTICLE V**
**NO SERVICING FEE**

SECTION 5.1 No **Servicing Fees.** The Servicer will not be entitled to receive any Servicing Fee and the Purchaser will have no obligation to pay any Servicing Fee.

**ARTICLE VI**
**THE SELLER**

C-68

SECTION 6.1 **RESERVED**

SECTION 6.2 **RESERVED**

SECTION 6.3 **RESERVED**

SECTION 6.4 **Covenants of the Seller.** The Seller hereby covenants that:

(a) Reserved.

(b) Reserved

(c) Other Liens or Interests. Except for the conveyances hereunder or as otherwise provided herein, (i) with respect to any Lease Assets, the Seller will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien on such Lease Assets or any interest therein, and (ii) following the conveyances hereunder, the Seller shall have no interest in such Lease Assets which it may be permitted to sell, pledge, assign or transfer to any Person. The Seller shall defend the right, title, and interest of the Purchaser, as provided herein, in and to such Lease Assets, including the conveyance, true sale of the Transferred Assets to the Purchaser, against all claims of third parties claiming through or under the Seller.

(d) Performance of Obligations; Servicing of Leases.

(i) The Seller will not take any action and will use its best efforts not to permit any action to be taken by others that would release any Person from any of such Person's material covenants or obligations under any instrument or agreement included in the Lease Assets or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except as expressly provided in this Agreement or such other instrument or agreement.

(ii) The Seller may contract with other Persons to assist it in performing its duties under this Agreement, and any performance of such duties by a Person identified to the Purchaser in an Officer's Certificate of the Seller shall be deemed to be action taken by the Seller. Initially, the Seller has contracted with the Servicer to assist the Seller in performing its duties under this Agreement.

(iii) The Seller will punctually perform and observe all of its obligations and agreements contained in this Agreement, the Related Documents and in the instruments and agreements included in the Lease Assets, including but not limited to filing or causing to be filed all UCC financing statements and continuation statements required to be filed by the terms of this Agreement in accordance with and within the time periods provided for herein and therein. Except as expressly provided herein, the Seller shall not waive, amend, modify, supplement or terminate any of its Related Documents or any provision thereof without the consent of the Purchaser.

(iv) If the Seller shall have knowledge of the occurrence of a Servicer Termination Event, the Seller shall promptly notify the Purchaser and shall specify in such notice the action, if any, the Seller is taking with respect of such default. If a Servicer Termination Event shall arise from the failure of the Servicer to perform any of its duties or obligations under this Agreement with respect to the Leases, the Seller shall take all reasonable steps available to it to remedy such failure.

C-104

(v)  The Seller agrees that it will not waive timely performance or observance by the Servicer of its duties under the Related Documents if the effect thereof would adversely affect the Purchaser.

SECTION 6.5  **Maintenance of Security Interests in Equipment.**  The Seller shall take such steps as are necessary to maintain perfection of any security interest created by each Lease in the related Equipment on behalf of the Purchaser and the Servicer, including, but not limited to, obtaining the execution by the Obligors and the recording, registering, filing, re-recording, re-filing, and re-registering of all security agreements, financing statements and continuation statements as are necessary to maintain such security interest granted by the Obligors under the respective Leases.  The Purchaser hereby authorizes the Seller, and the Seller agrees, to take any and all steps necessary to re-perfect such security interest on behalf of the Purchaser and the Seller as necessary because of the relocation of Equipment or for any other reason.

**ARTICLE VII**
**THE SERVICER**

SECTION 7.1  **Liability of Servicer; Indemnities.**

(a)  The Servicer shall be liable hereunder only to the extent of the obligations in this Agreement specifically undertaken by the Servicer and the representations, warranties and covenants made by the Servicer.

(b)  The Servicer shall indemnify, defend and hold harmless the Purchaser, the Seller, and their respective officers, directors, agents and employees from and against any and all costs, expenses, losses, claims, damages and liabilities to the extent that such cost, expense, loss, claim, damage or liability arose out of, or was imposed upon the Purchaser, the Seller, CMC or their respective officers, directors, agents and employees through the Servicer's breach of this Agreement, the negligence, willful misfeasance or bad faith of the Servicer in the performance of its duties under this Agreement or by reason of reckless disregard of its obligations and duties under this Agreement.

(c)  The Servicer shall indemnify, defend and hold harmless the Seller, in its individual capacity, its officers, directors, agents and employees, from and against all costs, taxes, expenses, losses, claims, damages and liabilities arising out of or incurred in connection with the acceptance or performance of the duties contained in the Related Documents, except to the extent that such cost, taxes (other than income taxes), expense, loss, claim, damage or liability is due to the willful misfeasance or gross negligence of the Seller.

(d)  Indemnification under this Article shall include, without limitation, reasonable fees and expenses of counsel and expenses of litigation. If the Servicer has made any indemnity payments pursuant to this Article and the recipient thereafter collects any of such amounts from others, the recipient shall promptly repay such amounts collected to the Servicer, together with any interest earned thereon.

(e)  The provisions of this Section shall survive the termination of this Agreement and of the Related Documents.

SECTION 7.2  **Merger or Consolidation of, or Assumption of Obligations of, the Servicer.** The Servicer shall not merge or consolidate with any other Person, convey, transfer or lease substantially all its assets as an entirety to another Person, or permit any other Person to become the successor to the

C-65

Servicer's business unless, after the merger, consolidation, conveyance, transfer, lease or succession, the successor or surviving entity shall be an Eligible Servicer and shall be capable of fulfilling the duties of the Servicer contained in this Agreement. Any corporation (i) into which the Servicer may be merged or consolidated, (ii) resulting from any merger or consolidation to which the Servicer shall be a party, (iii) which acquires by conveyance, transfer, or lease substantially all of the assets of the Servicer, or (iv) succeeding to the business of the Servicer, in any of the foregoing cases shall execute an agreement of assumption to perform every obligation of the Servicer under this Agreement and, whether or not such assumption agreement is executed, shall be the successor to the Servicer under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties to this Agreement, anything in this Agreement to the contrary notwithstanding; provided, however, that nothing contained herein shall be deemed to release the Servicer from any obligation. The Servicer shall provide notice of any merger, consolidation or succession pursuant to this Section to the Purchaser and the Seller. Notwithstanding the foregoing, the Servicer shall not merge or consolidate with any other Person or permit any other Person to become a successor to the Servicer's business, unless (a) immediately after giving effect to such transaction, no representation or warranty made pursuant to Section 3.6 shall have been breached (for purposes hereof, such representations and warranties shall speak as of the date of the consummation of such transaction) and no event that, after notice or lapse of time, or both, would become a Servicer Termination Event shall have occurred and be continuing, (b) the Servicer shall have delivered to the Purchaser and the Seller a certificate of a Responsible Officer of the Servicer and an Opinion of Counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Agreement relating to such transaction have been complied with, and (c) the Servicer shall have delivered to the Purchaser and the Seller an Opinion of Counsel, stating that, in the opinion of such counsel, either (1) all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary to preserve and protect the interests of the Purchaser in the Lease Assets and reciting the details of the filings or (2) no such action shall be necessary to preserve and protect such interest.

SECTION 7.3 **Limitation on Liability of Servicer and Others.** Neither the Servicer nor any of the directors or officers or employees or agents of the Servicer shall be under any liability to the Purchaser, the Seller, or CMC except as provided in this Agreement or for breach of its obligations under this Agreement, for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement; provided, however, that this provision shall not protect the Servicer or any such person against any liability that would otherwise be imposed by reason of a breach of this Agreement or willful misfeasance, bad faith or negligence (excluding errors in judgment made in good faith unless it is proved that the Servicer was negligent in ascertaining the pertinent facts) in the performance of duties; provided further, that this provision shall not affect any liability to indemnify the Purchaser or the Seller for costs, taxes, expenses, claims, liabilities, losses or damages paid by the Purchaser or the Seller, each in its individual capacity. Nothing contained in this Section 7.3 shall preclude or limit the Purchaser's rights to make a claim and collect amounts due under any Surety Bond with respect to any Defaulted Lease.

SECTION 7.4 **Servicer Not to Resign.** Subject to the provisions of Section 7.2, the Servicer shall not resign from the obligations and duties imposed on it by this Agreement as Servicer except upon a determination that by reason of a change in legal requirements the performance of its duties under this Agreement would cause it to be in violation of such legal requirements in a manner which would have a material adverse effect on the Servicer, and the Purchaser does not elect to waive the obligations of the Servicer to perform the duties which render it legally unable to act or to delegate those duties to another Person. Any such determination permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Purchaser and the Servicer. No resignation of the Servicer shall become effective until a successor Servicer that is an Eligible Servicer shall have assumed the responsibilities and obligations of the Servicer; provided, however, that in the event a successor

C-66

Servicer is not appointed within 60 days after the Servicer has given notice of its resignation and has provided the Opinion of Counsel required by this Section, the Servicer may petition a court for its removal and appointment of a successor.

SECTION 7.5  **Corporate Existence.**  The Servicer shall maintain its existence, rights and franchises as a corporation under the laws of the jurisdiction of its incorporation, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which the failure to so qualify would have an adverse effect on the validity or enforceability of any Lease or this Agreement or on the ability of the Servicer to perform its duties under this Agreement.

## ARTICLE VIII
## SERVICER TERMINATION EVENTS

SECTION 8.1  **Servicer Termination Event.**  For purposes of this Agreement, each of the following shall constitute a "Servicer Termination Event":

(a)  Any failure by the Servicer to deposit within the time periods specified in this Agreement in the Collection Account for distribution to the Purchaser, or to distribute to the Purchaser or the Seller, any proceeds or payment required to be so deposited or distributed under the terms of this Agreement that continues unremedied for a period of five Business Days after written notice is received by the Servicer from the Purchaser or the Seller or after discovery of such failure by a Responsible Officer of the Servicer; or

(b)  With respect to any Payment Date, failure by the Servicer to deliver to the Seller and the Purchaser the Servicer's Report by the related Determination Date or failure on the part of the Servicer to observe its covenants and agreements set forth in Section 7.2;: or

(c)  Failure on the part of the Servicer duly to observe or perform in any material respect any other covenants or agreements of the Servicer set forth in this Agreement which failure (i) materially and adversely affects the rights of the Purchaser or the Seller, and (ii) continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Purchaser or the Seller; after discovery by a responsible officer of the Servicer or

(d)  (i) The commencement of an involuntary case under the federal bankruptcy laws, as now or hereinafter in effect, or another present or future federal or state bankruptcy, insolvency or similar law and such case is not dismissed within 60 days; or (ii) the entry of a decree or order for relief by a court or regulatory authority having jurisdiction in respect of the Servicer in an involuntary case under the federal bankruptcy laws, as now or hereafter in effect, or another present or future, federal or state, bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Servicer or of any substantial part of their respective properties or ordering the winding up or liquidation of the affairs of the Servicer; or

(e)  The commencement by the Servicer of a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any other present or future, federal or state, bankruptcy, insolvency or similar law, or the consent by the Servicer to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Servicer or of any substantial part of its property or the making by the Servicer of an assignment for the benefit of creditors or the failure by the Servicer generally to pay its debts as such debts become due or the taking of corporate action by the Servicer in furtherance of any of the foregoing; or

C-67

(f) Any representation, warranty or statement of the Servicer made in this Agreement or any certificate, report or other writing delivered by the Servicer pursuant hereto shall prove to be incorrect in any material respect as of the time when the same shall have been made, the incorrectness of such representation, warranty or statement has a material adverse effect on the Purchaser or the Seller, and, within 30 days after written notice thereof shall have been given to the Servicer by the Purchaser or the Seller of the circumstances or condition in respect of which such representation, warranty or statement was incorrect shall not have been eliminated or otherwise cured, provided that the Purchaser, in all instances, shall have the right to rely on any report it receives from the Servicer to make claims under the Surety Bonds.

SECTION 8.2 **Termination of Servicer;** The Servicer or Sub-Servicer may only be terminated by Purchaser upon the cancellation of all outstanding related surety bonds or if Surety fails to make payment under the terms of the Surety Bond after proper demand has been given by the Purchaser.

SECTION 8.3 **Servicer to Act; Appointment of Successor.**

(a) On and after the time the Servicer receives a notice of termination pursuant to Section 8.2, the Purchaser or its designee, unless and until another successor Servicer is appointed, shall be the successor in all respects to the Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for in this Agreement, and shall be subject to all the responsibilities, restrictions, duties, liabilities and termination provisions relating thereto placed on the Servicer by the terms and provisions of this Agreement but only to the extent arising subsequent to the date of the notice of termination and within the Purchaser's control. The Seller and the Servicer shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession.

(b) Notwithstanding the foregoing, the Purchaser may, if it shall be unwilling to so act, or shall, if it is legally unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any Eligible Servicer as the successor to the Servicer hereunder in the performance of all or any part of the responsibilities, duties or liabilities of the Servicer hereunder. Pending appointment of a successor pursuant to the preceding sentence, the Purchaser or its designee shall act as successor Servicer unless it is legally unable to do so, in which event the outgoing Servicer shall continue to act as Servicer until a successor has been appointed and accepted such appointment.

(c) In connection with such appointment and assumption, the Purchaser may make such arrangements for the compensation of such successor as the Purchaser and such successor shall agree with the consent of CMC, which consent shall not be unreasonably withheld; provided, however, that such compensation shall be consistent with the commercially reasonable and customary compensation paid to other servicers servicing leases similar to the Leases. The Servicer and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession.

(d) If a successor Servicer is acting as Servicer hereunder, it shall be subject to termination under Section 8.2 upon the occurrence of any Servicer Termination Event applicable to it as Servicer.

SECTION 8.4 **Notification to CMC.** Upon any termination of, or appointment of a successor to, the Servicer pursuant to this Article VIII, the Servicer shall give prompt written notice thereof to CMC at its address as provided herein.

SECTION 8.5 **Waiver of Past Defaults.** The Purchaser may waive any default by the Servicer in the performance of its obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any Servicer Termination Event arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

**ARTICLE IX**
**SUBSTITUTION OF LEASES**

SECTION 9.1 **Substitution.**

(a)  Subject to the satisfaction of the requirements set forth in Section 9.1(b) hereof, and as provided in Section 2.6 and, with respect to the Servicer, Sections 3.2(f) and 3.4(g), the Seller and the Servicer will have the right (but not the obligation) at any time to substitute one or more Substitute Leases and the Equipment subject thereto for a Lease (for purposes of this Section 9.1, such Lease referred to as a "Predecessor Lease") and the Equipment subject thereto if:

(i)  the Predecessor Lease became (A) a Liquidated Lease, (B) a Warranty Lease or (C) an Adjusted Lease during the immediately preceding Collection Period; and

(ii)  the aggregate Principal Balance of the Liquidated Leases, Adjusted Leases and Warranty Leases that are Predecessor Leases shall not in the aggregate exceed 10% of the Initial Pool Principal Balance.

(b)  Each transfer of Substitute Leases will be subject to the satisfaction of the following conditions precedent:

(i)  after giving effect to such substitutions and any adjustments pursuant to Section 3.2, the aggregate Book Value of such Leases must be not less than 90% of the Book Value of the Leases substituted or adjusted since the Closing Date.

(ii)  the due date of the final Scheduled Payment on such Substitute Lease must be not sooner than during July 2004, and any Scheduled Payments due after September 2004 may not be included in the Principal Balance of such Lease for the purpose of making any calculation under this Agreement.

(iii)  the Principal Balance of all Leases, after giving effect to such adjustments and substitutions, must not be less than the Principal Balance of all Leases prior to such adjustment or substitution (without giving effect to the proviso to the definition of "Principal Balance").

(iv)  the Monthly Base Distribution Amount shall not change as a result of any such Substitute Lease.

SECTION 9.2 **Procedure.**

(a)  By 5:00 p.m., Georgia time, on the Business Day prior to each Deposit Date, CMC shall give written notice to the Servicer of any substitution of Substitute Leases for Predecessor Leases during the preceding Collection Period.  By 5:00 p.m., Georgia time, on the Deposit Date, CMC shall deliver to the Purchaser, the Seller and the Servicer (i) a supplement to Exhibit A hereto setting forth the information shown thereon for each such Substitute Lease, (ii) an Officer's Certificate (A) certifying that each such Substitute Lease is an Eligible Lease, (B) specifying each Predecessor Lease for which a substitution has been made and the Principal Balance and the Book Value under each such Predecessor Lease and the

C-69

Principal Balance and the Book Value under each Substitute Lease being transferred thereby and (C) that all conditions precedent to such addition or substitution have been satisfied and (iii) such additional information concerning such Substitute Leases or Predecessor Leases as may be needed for the Servicer to prepare its Servicer's Certificates pursuant to Section 3.9 and to otherwise carry out its duties as servicer hereunder.

(b) RESERVED

(c) The delivery of any Officer's Certificate and supplement to Exhibit A pursuant to Section 9.2(a) shall be conclusive evidence, without further act or deed, that during the immediately preceding Collection Period and as of the related Cut-Off Date (i) the Seller assigned to the Purchaser pursuant to Section 9.1 hereof all of the Transferred Assets and related security interests related to the Substitute Leases identified in such supplement as described in Section 2.1 hereof and (ii) the Purchaser assigned and transferred to the Seller, without representation or warranty, all of the Purchaser's right, title and interest in and to the Transferred Assets and related security interests related to the Predecessor Leases identified in such Officer's Certificate. Upon such assignment of a Substitute Lease, the Purchaser shall be deemed to have appointed and the Servicer shall be deemed to have accepted appointment as Custodian of the related Lease File pursuant to Section 2.2.

SECTION 9.3  **Reserved.**

SECTION 9.4  **CMC's and Servicer's Subsequent Obligations.**  Upon any substitution of Leases in accordance with the provisions of this Section 9, CMC's, the Seller's and the Servicer's obligations hereunder with respect to the Predecessor Lease shall cease but CMC, the Seller and the Servicer shall each thereafter have the same obligations with respect to the Substitute Lease substituted as it has with respect to all other Leases subject to the terms hereof.

# ARTICLE X
## MISCELLANEOUS PROVISIONS

SECTION 10.1  **Amendment.**  This Agreement together with the Related Documents constitutes the entire agreement of the parties with respect to the subject matter hereof and may be amended from time to time only pursuant to a writing signed by the Purchaser, the Seller, and the Servicer.

SECTION 10.2  **Protection of Title to Lease Assets.**

(a) The Seller shall execute and file such financing statements and cause to be executed and filed such continuation and other statements, all in such manner and in such places as may be required by law fully to preserve, maintain and protect the interests of the Seller, the Purchaser and the Servicer in the Lease Assets and in the proceeds thereof; and shall list the Purchaser as assignee of the security interests. The Seller shall deliver (or cause to be delivered) to the Purchaser and the Servicer file-stamped copies of, or filing receipts for, any document filed as provided above, as soon as available following such filing. The Servicer, in all events, shall cause Seller to take foregoing actions as to protect the Purchaser's title to and first priority security interest in the Transferred Assets.

(b) Neither the Seller nor the Purchaser shall change its name, identity or corporate structure in any manner that would, could or might make any financing statement or continuation statement filed by the Seller in accordance with paragraph (a) above seriously misleading within the meaning of Section 9-402(7) of the UCC, unless it shall have given the Purchaser and the Servicer at least 60 days' prior written notice



thereof, and shall promptly file appropriate amendments to all previously filed financing statements and continuation statements.

(c) Each of the Seller, the Servicer and the Purchaser shall give the Seller, the Purchaser and the Servicer, as the case may be, with prior written notice of any relocation of its principal executive office if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement. The Servicer shall at all times maintain each office from which it services Leases and its principal executive office within the United States of America.

(d) The Servicer shall maintain accounts and records as to each Lease accurately and in sufficient detail to permit (i) the reader thereof to know at any time the status of such Lease, including payments and recoveries made and payments owing (and the nature of each) and (ii) reconciliation between payments or recoveries on (or with respect to) each Lease and the amounts from time to time deposited in the Collection Account in respect of such Lease.

(e) The Servicer shall maintain its computer systems so that, from and after the time of sale, transfer and/or assignment under this Agreement of the interests in the Leases, Lease Assets, the Equipment and/or security interests therein to the Purchaser as provided in Section 2.1, the Servicer's records (including any backup archives) that refer to any Lease indicate clearly that such interests and contract rights are owned or held by the Purchaser. In addition, an appropriate legend shall be stamped on each original Lease agreement indicating the Purchaser's ownership interest and security interest in the Lease and Transferred Assets. Indication of the Purchaser's ownership and security interests in such Lease, Lease Assets and Equipment shall be deleted from or modified on the Servicer's computer systems when, and only when, the Lease has been paid in full, it has been liquidated (including receipt of all recoveries reasonably expected to be collected), a Substitute Lease is substituted therefor, or it is purchased by the Servicer or CMC.

(f) Upon receipt by the Servicer of reasonable prior notice, the Servicer shall permit the Purchaser, the Seller, CMC and their respective agents and regulators, at any time during the Servicer's normal business hours with 30 Days written notice to inspect, audit and make copies of and abstracts from the Servicer's records regarding any Leases or any other portion of the Lease Assets.

(g) The Servicer shall furnish to the Purchaser, CMC and the Seller at any time upon request a list (which may, at the option of the Servicer, be on a computer disk or other electronic storage medium compatible with the Purchaser's systems) of all Leases then held as part of the Lease Assets, together with a reconciliation of such list to the Schedule of Leases and to each of the Servicer's Certificates furnished before such request indicating removal of Leases from the Purchaser. Upon request, the Servicer shall furnish a copy of any list to the Purchaser, CMC or Seller. The Purchaser shall and shall cause its representatives to hold in confidence all information thereon relating to the identity of the Obligors except to the extent disclosure may be required by Section 9-208 of the UCC or by other applicable law (and all reasonable applications for confidential treatment are unavailing) and except to the extent that the Purchaser may reasonably determine that such disclosure is consistent with its obligations or exercise of its rights under this Agreement.

SECTION 10.3   **Governing Law.**   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AGREEMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

C-71

SECTION 10.4  **Severability of Provisions.**  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Lease Obligations or the rights of the Purchaser.

SECTION 10.5  **Assignment.**  Notwithstanding anything to the contrary contained in this Agreement, except as provided in Section 7.2 or Section 8.2 (and as provided in the provisions of the Agreement concerning the resignation of the Servicer), this Agreement may not be assigned by the Seller or the Servicer without the prior written consent of the Purchaser.

SECTION 10.6  **Third-Party Beneficiaries.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Agreement.

SECTION 10.7  **Counterparts.**  For the purpose of facilitating its execution and for other purposes, this Agreement may be executed (including by facsimile signatures) simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and all of which counterparts shall constitute but one and the same instrument.

SECTION 10.8  **Intention of Parties.**  The parties hereto intend that, in the event that the conveyance of the Leases and other Lease Assets pursuant to this Agreement is determined to be made as security for a loan made by the Purchaser or the Purchaser to the Seller, the Seller hereby grants to the Purchaser to secure such loan a first priority security interest in all of the Seller's right, title and interest in and to the rights and property intended to be conveyed to the Purchaser pursuant to Section 2.1(a). This Agreement shall, in such event, constitute a security agreement under applicable law.

SECTION 10.9  **Notices.**  All demands, notices and communications under this Agreement shall be in writing, personally delivered or mailed by certified mail-return receipt requested, or by facsimile transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Purchaser, at the following address:  Net.B@nk , 950 North Point Parkway, Suite 350, Alpharetta, GA 30005, Attention: Jeff Watson (b) in the case of the Servicer, at the following address:  SAFECO INSURANCE COMPANY OF AMERICA c/o Anthony & Morgan Surety Company, 635 Camino De Los Mares, Suite 300, San Clemente, CA 92672, Attention: Michael Anthony, (c) in the case of the Seller, at the following address: 101 Convention Center Drive, Suite 1225, Las Vegas, Nevada 89109, Attention: Wayne Pirtle; and (d) in the case of CMC,as the Sub-Servicer, at the following address: 221 W. Crest Street, Suite 200, Escondido, CA 92025, Attention: Ronald Fisher; or at such other address as shall be designated by any such party in a written notice to the other parties.

Section 10.10  **Time of Essence.**  Time is of the essence of this Agreement

**IN WITNESS WHEREOF**, the Purchaser, the Seller, CMC and the Servicer have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

SELLER:
COMMERCIAL MONEY CENTER, INC.

By:_____

C-12

Sterling W. Pirtle, President

SERVICER:
SAFECO INSURANCE COMPANY OF AMERICA

By:_____


PURCHASER:
NET.B@NK, A Federal Savings Bank

By:_____


AS SUB-SERVICER:
COMMERCIAL MONEY CENTER, INC.

By:_____
    Sterling W. Pirtle, President

C-73

**EXHIBIT A**

**SCHEDULE OF LEASES AND EQUIPMENT**

**EXHIBIT B**
**FORM OF SERVICER'S REPORT**

**IN WITNESS WHEREOF** the undersigned has hereunto set his/her hand this _____ day of
_____, _____.

COMMERCIAL MONEY CENTER, INC.

By:_____

Name:_____

Title:_____

D-15

## ASSIGNMENT

IN CONSIDERATION OF THE SUM OF <u>Five Million 00/100</u> DOLLARS (<u>$5,000,000.00</u>), the receipt, adequacy and sufficiency of which is hereby acknowledged, Commercial Money Center, Inc., a Nevada corporation (the "Assignor"), hereby assigns, transfers and conveys to Investor (the "Assignee"), its successors and assigns, pursuant to and subject to the terms of that certain Sale and Servicing Agreement dated as of December 22, 1999 among Assignor, Assignee and the other parties identified therein (the "Agreement") the following:

      1.     All contract rights under each Lease listed on <u>Exhibit A</u> attached hereto to receive all Scheduled Payments commencing with such payments due in the Collection Period commencing with the Initial Cut-Off Date and continuing thereafter for each succeeding Collection Period for the remaining lease period, including the foregoing first Collection Period (excluding those Scheduled Payments due prior to, but not received as of, the Cut-Off Date, but including those Scheduled Payments due on or after, but received prior to, the Cut-Off Date);

      2.     All funds on deposit from time to time in the Collection Account;

      3.     All rights under the Surety Bonds; and

      4.     Any and all proceeds of the foregoing.

Defined terms used herein and not otherwise defined herein shall have the meanings set forth in the Agreement. The Agreement shall survive the execution and delivery of this Assignment.

IN WITNESS WHEREOF, the Assignor has caused this Assignment to be duly executed and delivered by a duly authorized corporate officer as of this 22nd day of December, 1999.

COMMERCIAL MONEY CENTER, INC.

By:_____

Title:_____

D-76

# Amendment I

This is Amendment I to the Sale and Servicing Agreement, dated as of December 22, 1999, (the "Agreement"), among NET.B@NK, a Federal Savings Bank, COMMERCIAL MONEY CENTER, INC., a Nevada Corporation, and SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation.  This Amendment I constitutes a Related Document as referred to in the Agreement. The following changes amend those definitions contained in the Agreement, effective on the Closing Date:  (i) the Initial Pool Principal Balance is changed from $3,020,818.84 to $3,074,418.46 (ii) the Original Principal Amount is changed from $3,020,818.84 to $3,074,418.46 and (iii) the Interest Rate is changed from 12% to 11.2287%.

Defined terms used herein and not defined herein shall have the meanings set forth in the Agreement.

**IN WITNESS WHEREOF**, the Purchaser, the Seller, CMC and the Servicer have caused this Amendment I to be duly executed by their respective officers this 22nd day of December 1999.

SELLER:
COMMERCIAL MONEY CENTER, INC.

By:_____
    Sterling W. Pirtle, President

SERVICER:
SAFECO INSURANCE COMPANY OF AMERICA

By:_____

PURCHASER:
NET.B@NK, A Federal Savings Bank

By:_____

AS SUB-SERVICER:
COMMERCIAL MONEY CENTER, INC.

By:_____
    Sterling W. Pirtle, President

D-77

E-78

**EXHIBIT E**

POWELL
GOLDSTEIN
FRAZER &
MURPHY LLP

ATLANTA     GENEVA     WASHINGTON

WESTERN REGION
SURETY CLAIMS

JAN 1 1 2002

William V. Custer
direct dial 404-572-6828
bcuster@pgfm.com

December 28, 2001

**VIA FACSIMILE & CERTIFIED U.S. MAIL**
**RETURN RECEIPT REQUESTED**

Safeco Insurance Company of America
c/o Anthony & Morgan Surety Company
Suite 300
635 Camino De Los Mares
San Clemente, CA  92672
Attention:  Michael Anthony

And

c/o Kenneth M. Martin
Sr. Account Specialist
Safeco Insurance Company of America
2677 N. Main Street
Suite 600
Santa Ana, CA  92705

Dear Sir:

This firm represents NetBank, a federal savings bank.

I am writing you in your respective capacities as servicer and as surety for those leases transferred by the Sales and Service Agreements with NetBank listed on Exhibit A and to which you are a party (the "Agreements").

This letter is written to:

(1)     Notify you that Commercial Money Center, Inc., the sub-servicer appointed under each of the Agreements, has failed to make the monthly payment to NetBank required under the terms of the Agreements and due on December 7, 2001.  The amount currently due under the Agreements is $901,406.42 as of December 27, 2001 and that amount continues to accrue interest.

(2)     Demand that you fully comply with your obligations under the Agreements to which you are a party including, but not limited to, Sections 3.1, 3.2, and 3.3 of the Agreements and fully protect the interests of NetBank.





December 31, 2001
Page 2

and,

(3)    Demand that pursuant to your obligations as servicer under the Agreements and surety under the Performance Bonds issued for each of the leases purchased by NetBank, you pay NetBank the sum of $901,406.42.

This notice and demand is in addition to and not in lieu of any other rights or remedies that NetBank may have under the terms of the Agreements or the Performance Bonds, all of which are expressly reserved by NetBank.

Please call me upon receipt of this letter to confirm that you have received it and that there is nothing further you require from NetBank in order to comply with your obligations under the terms of the Agreements and the Performance Bonds. Otherwise, NetBank will assume and rely upon the fact that this notice and demand is sufficient. If you have any questions or require further information, please call me or Ricky Camp at NetBank (770.343.6006 ext. 1498).

I look forward to your advice and prompt payment.

Sincerely,

William V. Custer

For POWELL, GOLDSTEIN, FRAZER & MURPHY LLP

WVC/cls

cc:    B. Scott Olson, Esq.
        Robert B. Weathersby, Esq.
        Mr. Ricky Camp
        Mr. Robert E. Bowers
        Mr. Patrick Dowling

::ODMA\PCDOCS\ATL\540684\1

E-80

EXHIBIT "A"

SALES AND SERVICE AGREEMENTS

| Date | | Purchaser | Seller | Servicer & Surety | Sub-Servicer |
|------|--|-----------|--------|-------------------|--------------|
| 3/18/99 | Sale and Servicing Agreement | NetBank | CMC | Amwest Surety Company/Royal Indemnity Company | CMC |
| 5/4/99 | Sale and Servicing Agreement | NetBank | CMC | Amwest Surety Company/Royal Indemnity Company | CMC |
| 2/4/00 | Sale and Servicing Agreement | NetBank | CMC | Amwest Surety Company/Royal Indemnity Company | CMC |
| 5/4/00 | Sale and Servicing Agreement | NetBank | CMC | Amwest Surety Company/Royal Indemnity Company | CMC |
| 6/6/00 | Sale and Servicing Agreement | NetBank | CMC | Amwest Surety Company/Royal Indemnity Company | CMC |
| 7/6/00 | Sale and Servicing Agreement | NetBank | CMC | Amwest Surety Company/Royal Indemnity Company | CMC |
| 9/6/00 | Sale and Servicing Agreement | NetBank | CMC | Amwest Surety Company/Royal Indemnity Company | CMC |
| 3/18/99 | Sale and Servicing Agreement | NetBank | CMC | Frontier Insurance Company/Illinois Union Insurance Company | CMC |
| 9/8/99 | Sale and Servicing Agreement | NetBank | CMC | Frontier Insurance Company/Illinois Union Insurance Company | CMC |
| 9/29/00 | Sale and Servicing Agreement | NetBank | CMC | Illinois Union Insurance Company | CMC |
| 10/23/00 | Sale and Servicing Agreement | NetBank | CMC | Illinois Union Insurance Company | CMC |
| 6/22/99 | Sale and Servicing Agreement | NetBank | CMC | Safeco Insurance Company of America | CMC |
| 7/20/99 | Sale and Servicing Agreement | NetBank | CMC | Safeco Insurance Company of America | CMC |
| 10/19/99 | Sale and Servicing Agreement | NetBank | CMC | Safeco Insurance Company of America | CMC |
| 11/30/99 | Sale and Servicing Agreement | NetBank | CMC | Safeco Insurance Company of America | CMC |
| 12/22/99 | Sale and Servicing Agreement | NetBank | CMC | Safeco Insurance Company of America | CMC |
| 3/16/00 | Sale and Servicing Agreement | NetBank | CMC | Safeco Insurance Company of America | CMC |
| 4/11/00 | Sale and Servicing Agreement | NetBank | CMC | Safeco Insurance Company of America | CMC |

F-81

540657

F-82

**ᗧepic** *funding corporation*

December 26, 2001

**VIA CERTIFIED MAIL – RECEIPT REQUESTED**

Commercial Money Center, Inc. ("CMC" or "Sub-Servicer")
221 West Crest Street, Suite 200
Escondido, CA 92025
Attention: Ronald Fisher

Commercial Money Center, Inc. ("Seller")
101 Convention Center Drive, Suite 1225
Las Vegas, NV 89109
Attention: Wayne Pirtle

Safeco Surety Insurance Company ("Servicer")
c/o Anthony & Morgan Surety Company
635 Camino de Los Mares, Suite 300
San Clemente, CA 92672
Attention: Michael Anthony

      RE:    Sale and Servicing Agreement among Epic Funding Corporation ("Purchaser"), Seller, Servicer and Sub-Servicer, dated as of February 24, 2000.

To Whom It May Concern:

    The delinquency on your account has become an extremely serious matter. **As of today's date your account remains past due for the November 20, 2001 payment of $144,525.28 and the December 20, 2001 payment of $144,525.28.** We very much want to work with you in this matter and understand that these situations do occur. However, you should also be aware that your obligations to us need to be paid promptly.

    **If we do not receive your past due payments or work out alternate arrangements within ten days from the date of this letter, you leave us no alternative but declare a Servicer Termination Event, as defined in the Agreement, and submit all outstanding surety bonds to the Servicer for payment under the bonds in accordance with the Agreement.**

    We would like to cooperate with you as much as we reasonably can, but our cooperation requires immediate attention. Please contact me at (925) 314-1164, or our office immediately upon receipt of this letter.

Sincerely,

David de Figueiredo
Senior Vice President, Operations

F-83

G-84

**EXHIBIT G**

*epic funding corporation*

| |
|---|
| WESTERN REGION SURETY CLAIMS |
| JAN 1 7 2002 |

January 8, 2002

**VIA AIRBORNE EXPRESS**

Safeco Surety Insurance Company ("Servicer")
c/o Anthony & Morgan Surety Company
635 Camino de Los Mares, Suite 300
San Clemente, CA 92672
Attention: Michael Anthony

**VIA REGULAR MAIL and WITHOUT ATTACHMENTS**

Mr. Howard Gewerter, Attorney at Law
Commercial Money Center, Inc., ("CMC", "Seller" or "Sub-Servicer")
101 Convention Center Drive, Suite 1225
Las Vegas, NV 89109

Re:    Sale and Servicing Agreement among Epic Funding Corporation ("Purchaser" and "Obligee"), Seller, Servicer and Sub-Servicer, dated as of February 24, 2000.

To Whom It May Concern:

We have not received the payments that are past due in reference to the above captioned Sale and Servicing Agreement. Therefore, we have no alternative but to declare a Servicer Termination Event, as defined in the Agreement. We hereby submit all outstanding surety bonds for immediate payment in accordance with the Agreement and demand payment in the amount of **$2,792,367.59**. As indicated in the bonds themselves, payment is due upon receipt of written demand by the Obligee. I have attached wire instructions for your convenience.

Do not hesitate to call me at 510-450-3149 immediately if any additional information is required.

Very truly yours,

David de Figueiredo
Senior Vice President, Operations

G-85



*epic funding corporation*

WESTERN REGION
SURETY CLAIMS

JAN 1 7 2002

January 8, 2002

**VIA AIRBORNE EXPRESS**

Safeco Surety Insurance Company ("Servicer")
c/o Anthony & Morgan Surety Company
635 Camino de Los Mares, Suite 300
San Clemente, CA 92672
Attention: Michael Anthony

**VIA REGULAR MAIL and WITHOUT ATTACHMENTS**

Mr. Howard Gewerter, Attorney at Law
Commercial Money Center, Inc., ("CMC", "Seller" or "Sub-Servicer")
101 Convention Center Drive, Suite 1225
Las Vegas, NV 89109

Re:    Sale and Servicing Agreement among Epic Funding Corporation ("Purchaser" and
       "Obligee"), Seller, Servicer and Sub-Servicer, dated as of February 24, 2000.

To Whom It May Concern:

We have not received the payments that are past due in reference to the above captioned Sale
and Servicing Agreement. Therefore, we have no alternative but to declare a Servicer
Termination Event, as defined in the Agreement. We hereby submit all outstanding surety
bonds for immediate payment in accordance with the Agreement and demand payment in the
amount of **$2,792,367.59**. As indicated in the bonds themselves, payment is due upon receipt of
written demand by the Obligee. I have attached wire instructions for your convenience.

Do not hesitate to call me at 510-450-3149 immediately if any additional information is required.

Very truly yours,

David de Figueiredo
Senior Vice President, Operations

G-86

## ATTACHMENT TO CIVIL CASE COVER SHEET

**VIII. RELATED CASES IF ANY:**

| JUDGE | DOCKET NUMBER |
|---|---|
| BARRY T. MOSKOWITZ | 02 CV 192 BTM (AJB) |
| NITA L. STORMES | 02 CV 0218 W ** |
| CYNTHIA AARON | 02 CV 0199 W ** |

**TRO's in above cases all handled by Judge Moscowitz

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

02 FEB 20   PM 2:38

SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY:

**DEFENDANTS**

COMMERCIAL MONEY CENTER, INC.; COMMERCIAL SERVICING CORPORATION; CAPITAL MARKETS CORPORATION; STERLING WAYNE PIRTLE; ANITA PIRTLE; RONALD FISHER and NANCY FISHER

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

KING COUNTY, WA

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**   Clark County, NV
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Michael T. Lowe/James G. Stanley
Booth Mitchel & Strange, LLP
701 S. Parker St., Suite 6500
Orange, CA 92868
(714) 480-8500

**ATTORNEYS (IF KNOWN)**

Harold Gewerter
101 Convention Center Drive, Suite 1225
Las Vegas, NV 89109
(702) 894-9400

02 CV 0308 J (POR)

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)** Breach of contract; Breach of Indemnity Agreement; Quia Timet; Specific Performance; and Equitable Indemnity 28 U.S.C. Sections 1332 and 1367 (a)

28:1332 be (Div)

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| | | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding
☐ 2 Removal from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE See attachment   Docket Number

DATE  20 February 2002   SIGNATURE OF ATTORNEY OF RECORD

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

PD $160.00 2/20/02   # 79680 VB